IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MELINDA LAMBERSON REYNOLDS, *Plaintiff* | : : : | |
| *v.* | : : | |
| COMMONWEALTH OF PENNSYLVANIA, | : : | CIVIL ACTION NO._____ |
| PENNSYLVANIA DEPARTMENT OF STATE, | : : : | Electronically Filed |
| PENNSYLVANIA BUREAU OF PROFESSIONAL AND OCCUPATIONAL AFFAIRS, | : : : : : | |
| PENNSYLVANIA DIVISION OF PROFESSIONAL HEALTH MONITORING PROGRAMS, and | : : : : | |
| PENNSYLVANIA STATE BOARD OF NURSING, *Defendants* | : : : | |

## **COMPLAINT**

### Introduction

1. Plaintiff Melinda Lamberson Reynolds ("Reynolds"), who was a practical nurse (LPN) and professional nurse (RN) licensed for over 15 years by the Commonwealth of Pennsylvania, is a person with a disability, chronic opioid drug dependency. Reynolds is currently being excluded by defendants from being licensed to practice her profession because of her participation in a methadone maintenance program to treat her drug dependency. Defendants' refusal to license Reynolds and/or suspension of her licenses is a violation of the Americans with Disabilities Act, 42 U.S.C. §12101, *et seq.* (the "ADA"), and Section 504 of the Rehabilitation Act, 29 U.S.C. §794. (the "Rehabilitation Act"). Reynolds brings this action for declaratory and injunctive relief to require that defendants end their discriminatory policies and

practices against nurses who participate in methadone maintenance programs, and to recover damages for the lost income and other damages that she has suffered as a result of such policies and practices.

**Jurisdiction, Parties and Venue**

2. Reynolds is a citizen of the Commonwealth of Pennsylvania and a resident of Pocono Summit, Monroe County, Pennsylvania which is within the Middle District of Pennsylvania.

3. Defendants are:

   (a) the Commonwealth of Pennsylvania ("Commonwealth");

   (b) the Commonwealth Department of State ("DoS");

   (c) the Bureau of Professional and Occupational Affairs ("BPOA") an agency of the Commonwealth under the DoS which provides administrative and legal support to professional licensing boards and commissions including the state Board of Nursing;

   (d) the Division of Professional Health Monitoring Programs ("PHMP"), an agency of the Commonwealth under the BPOA, which includes the "Voluntary Recovery Program" ("VRP") and the "Disciplinary Monitoring Unit" ("DMU");

   (e) the State Board of Nursing ("BoN"), an agency of the Commonwealth under the DoS which, among other things, is charged with the responsibility to establish rules and regulations for the licensure and practice of professional and practical nursing in Pennsylvania.

4. Defendants Commonwealth, DoS, BPOA, PHMP and BoN all receive financial assistance from the federal government and are therefore subject to the requirements of Section 504 of the Rehabilitation Act., 29 U.S.C. §794.

5. Defendants Commonwealth, DoS, BPOA, PHMP and BoN all have offices within the Middle District of Pennsylvania.

6. This Court has jurisdiction over Reynolds' claims pursuant to 28 U.S.C. §§1331 and 1343(a)(3).

7. Venue is proper in this District pursuant to 28 U.S.C. §1391 in that all defendants reside in this District and a substantial part of the events and omissions giving rise to the claim occurred in this District.

## Facts Applicable To All Claims

### A. Methadone and Methadone Maintenance Treatment

8. Methadone is a legal, synthetic opioid drug which is used medically as a maintenance anti-addictive treatment for persons suffering from chronic opioid drug dependency.

9. The efficacy of methadone for treatment of chronic opioid drug dependency is well-established.

10. For example, more than ten years ago, an expert panel at a National Institutes of Health (NIH) Consensus Development Conference on Effective Medical Treatment of Heroin Addiction concluded:

> [A]ddiction to opiate drugs such as heroin is a disease of the brain and a medical disorder that can be effectively treated. Methadone treatment significantly lowers illicit opiate drug use, reduces opiate-related illness and death, reduces crime, and enhances social productivity. . . .

Mathias, "NIH Panel Calls for Expanded Methadone Treatment for Heroin Addiction" (National Institute on Drug Abuse, November/December 1997), available on the Internet at http://www.nida.nih.gov/NIDA_Notes/NNVol12N6/NIHPanel.html.

11.     A Methadone Fact Sheet issued by the Executive Office of the President, Office of National Drug Control Policy, and cited by the United States Court of Appeals for the Third Circuit in *New Directions Treatment Services v. City of Reading,* 490 F.3d 293, 296 n.1 (2007), explains among other things how methadone maintenance treatment reduces cravings for illegal drugs without the other adverse effects caused by the illegal drugs:

> **Methadone is a rigorously well-tested medication that is safe and efficacious for the treatment of narcotic withdrawal and dependence**.  For more than 30 years this synthetic narcotic has been used to treat opioid addiction.  Heroin [and other opioid drugs] releases an excess of dopamine in the body and causes users to need an opiate continuously occupying the opioid receptor in the brain.  Methadone occupies this receptor and is the stabilizing factor that permits addicts on methadone to change their behavior and to discontinue heroin use.
>
> Taken orally once a day, methadone suppresses narcotic withdrawal for between 24 and 36 hours.  Because methadone is effective in eliminating withdrawal symptoms, it is used in detoxifying opiate addicts.  It is, however, only effective in cases of addiction to heroin, morphine, and other opioid drugs, and it is not an effective treatment for other drugs of abuse.  **Methadone reduces the cravings associated with heroin use and blocks the high from heroin, but it does not provide the euphoric rush**.  Consequently, methadone patients do not experience the extreme highs and lows that result from the waxing and waning of heroin in blood levels.  Ultimately, the patient remains physically dependent on the opioid, but is freed from the uncontrolled, compulsive, and disruptive behavior seen in heroin addicts.
>
> Withdrawal from methadone is much slower than that from heroin.  As a result, **it is possible to maintain an addict on methadone without harsh side effects**.  Many MMT patients require continuous treatment, sometimes over a period of years.
>
> Methadone maintenance treatment provides the heroin addict with individualized health care and medically prescribed methadone to relieve withdrawal symptoms, reduces the opiate craving, and brings about a biochemical balance in the body.  Important elements in heroin treatment include comprehensive social and rehabilitation services.

Methadone Fact Sheet (emphasis added), available on the Internet at

http://www.whitehousedrugpolicy.gov/publications/factsht/methadone/index.html.

12.     The Methadone Fact Sheet also explains that

> Methadone does not impair cognitive functions. It has no adverse effects on mental capability, intelligence, or employability. It is not sedating or intoxicating, nor does it interfere with ordinary activities such as driving a car or operating machinery. Patients are able to feel pain and experience emotional reactions. Most importantly, methadone relieves the craving associated with opiate addiction. For methadone patients, typical street doses of heroin are ineffective at producing euphoria, making the use of heroin less desirable.

*Id.*

13. Therefore:

   (a) Opioid drug dependency is a disability within the meaning of the ADA and the Rehabilitation Act;

   (b) Methadone maintenance treatment is a reasonable accommodation for persons suffering from opioid drug dependency, which permits persons who are disabled by chronic opioid drug dependency to perform the essential functions of the nursing profession skillfully and safely;

   (c) Permitting a person who suffers from opioid drug dependency, which is being successfully treated in a methadone maintenance program, to engage in the practice of nursing does not pose a significant risk to the nurse's patients or fellow workers.

### B. Defendants Are Discriminating Against Reynolds Who Is A Qualified Person With A Disability

14. Reynolds is qualified by her training and experience to be licensed as a practical nurse ("LPN") and professional nurse ("RN").

15. Moreover, the ADA specifically provides that a person like Reynolds who is not currently engaging in the illegal use of drugs may be a "qualified person" for purposes of the ADA. 42 U.S.C. §12114(a) and (b).

16. Reynolds is a person with a disability within the meaning of both the ADA and the Rehabilitation Act in that: (a) she has a past history in the 1970s and early 1980s of opioid

5

drug dependency; (b) she is not currently engaging in the illegal use of drugs; (c) she is currently participating in a supervised rehabilitation program; (d) currently and since 1987 she has been under treatment for a chronic and painful condition known as endometriosis for which she has received lawful prescriptions for pain medication; (e) she was prescribed ever-increasing amounts of the pain medications because of her endometriosis; and (f) her past history of opioid drug dependency and her treatment for endometriosis placed her at risk for use of illegal opioid drugs, a risk which can be minimized or avoided by methadone maintenance treatment.

17.     Reynolds was licensed for over 25 years as a nurse, first pursuant to an LPN license granted by the State of New Jersey in 1980 and then pursuant to a Pennsylvania LPN license granted by the BoN in 1991 and a Pennsylvania RN license granted by the BoN in 2000.

18.     However, since January 2007, Reynolds has been unable to work as a nurse because of defendants' discriminatory actions against her in violation of the ADA and the Rehabilitation Act.

19.     Opioid drug dependency is a chronic condition, and persons like Reynolds who suffer from opioid drug dependency are vulnerable to resuming their use of opioid drugs under conditions of stress including serious intractable pain such as the pain from Reynolds' endometriosis.

20.     Because of her disability as described in paragraph 16, and the chronic nature of both her opioid drug dependency and endometriosis, Reynolds was concerned in 1997 that she was at risk for resuming her use of illegal opioid drugs, and therefore sought methadone maintenance treatment in order to prevent this and in order to be able to continue her employment as a licensed nurse.

21.     As described in more detail at paragraphs 8 through 13, *supra,* methadone maintenance therapy makes it possible for persons with a past history of chronic opioid drug dependency to abstain from the use of illegal opioid drugs, and has no adverse side-effects that would adversely affect the disabled person's job performance.

22.     Notwithstanding her disability, Reynolds can perform safely and skillfully as a nurse while participating in a methadone maintenance program.

23.     The fact that Reynolds is receiving methadone maintenance treatment does not result in any threat to the safety or well-being of persons with whom Reynolds comes in contact including patients and fellow workers.

24.     From 1997 through 2004, Reynolds received methadone maintenance treatment at Morris County Aftercare in Randolph, New Jersey, and since 2004, she has received methadone maintenance treatment at New Directions Treatment Services ("NDTS") in Bethlehem, Pennsylvania.

25.     NDTS is accredited by the Commission on Accreditation of Rehabilitation Facilities ("CARF") pursuant to standards issued by the Substance Abuse and Mental Health Services Administration ("SAMHSA"), U.S. Department of Health and Human Services, to provide methadone maintenance treatment.

26.     The methadone maintenance program at NDTS in which Reynolds has participated since 2004 is a supervised rehabilitation program which includes the following features: (a) Reynolds' methadone dose is dispensed to her directly by an NDTS nurse, including both on-site doses and take-home doses which are distributed once a week; (b) Reynolds is visually evaluated by the dispensing nurse weekly; (c) Reynolds is also evaluated

by an NDTS physician at least once yearly; (d) Reynolds meets periodically with a counselor; and (e) Reynolds is screened on-site on a regular basis at NDTS for drug usage.

27. Reynolds' participation in methadone maintenance programs has not prevented and does not currently prevent her from practicing as a nurse safely and skillfully.

28. On the contrary, Reynolds has received many letters of recommendation from her employers during the period that she was receiving methadone maintenance treatment.

29. At least since 2005, and continuing at the present time, defendants have established and followed an unpublished but inflexible policy and practice of refusing to license or relicense as a nurse any person who is participating in a methadone maintenance program. This policy and practice is hereinafter referred to as the "exclusion policy."

30. The exact terms and parameters of the exclusion policy are unknown to Reynolds, because of its unpublished nature, but it is adhered to by the defendants, their subsidiary and component agencies, their agents and employees and others who are in active concert or participation with them, with the purpose and effect of unlawfully excluding disabled persons like Reynolds, who require methadone maintenance treatment, from being licensed as nurses.

31. As a direct result of the exclusion policy, defendants have wrongfully, arbitrarily and capriciously excluded Reynolds from participation in their services, programs and activities, to wit, licensing as a nurse, by reason of her disability and have refused to permit Reynolds to be licensed as long as she is participating in a methadone maintenance program, the reasonable accommodation that she requires.

### C. The Incident Which Led To Defendants' Actions Against Reynolds

32. Reynolds also suffers from chronic hepatitis C for which she was receiving treatment in 2005 with legal prescription medications (interferon and ribovarin) which caused

8

her to suffer from anemia and exhaustion.  Reynolds also had a prescription for Ambien, a sleep aid.

33. In February 2005, Reynolds was working for a nurse staffing agency, IntelStaf Healthcare.  During this time, Reynolds was away from home overnight visiting her mother, had not brought her Ambien prescription with her, and therefore took another prescription sleep aid, Restoril, borrowed from her mother.  The following day, which was February 6, 2005, she was observed by her supervisor to be suffering from exhaustion, and requested to submit to a drug screening test.

34. Restoril is one of a class of drugs known as benzodiazepines.

35. The drug screening showed that Reynolds had taken Restoril.  Reynolds was continuing on methadone maintenance treatment at this time, but this was not covered in the report since the drug test provider did not report on drugs covered by a doctor's prescription.

36. Even though Reynolds' use of her mother's Restoril was limited to this single occasion when she was away from home and had not brought her own Ambien prescription, the positive result for Restoril was reported to the state, and she was contacted by or referred to the state's Voluntary Recovery Program ("VRP"), a program within the BPOA.

37. On May 15, 2006, the DoS filed with the BoN a petition to require Reynolds to submit to a mental and physical examination.  A copy of the petition is attached hereto and incorporated herein by reference as Exhibit A.

38. The May 15, 2006 petition stated as the basis for this request that Reynolds had exhibited "erratic" behavior at work, had tested positive for benzodiazepines; and had been found eligible for VRP but had not completed enrollment.  The BoN granted the petition, and on

May 22, 2006, Reynolds was ordered to undergo a mental and physical examination by George E. Woody, M.D.

### C. Dr. Woody, The Expert Designated By Defendants To Examine Reynolds, Emphasized Her "Positive Response to Methadone Maintenance" and Concluded That She Was "Able to Practice Nursing With The Requisite Skill And Safety."

39. Dr. Woody, the expert designated by defendants to examine Reynolds, is a widely recognized authority on drug addiction, including the use of methadone as part of medical treatment for persons suffering from chronic opioid drug dependency.

40. Reynolds was examined by Dr. Woody on July 20, 2006. Reynolds told him about her addiction history and about being on methadone maintenance treatment. Following his examination, Dr. Woody issued a report dated August 30, 2006, a copy of which is attached hereto and incorporated herein by reference as Exhibit B. Dr. Woody's report concluded that Reynolds was "able to practice nursing with the requisite skill and safety" and emphasized her "positive response to methadone maintenance" as a fact that supported his conclusion:

> **In view of her positive response to methadone maintenance** over a period of at least 1.5 years; the absence of current unprescribed drug use by history and a review of the medical records, the psychiatric examination and urine test results that were positive only for drugs that are currently prescribed (methadone, benzodiazepine); and the report from a recent employer that her work has been good during a period of time that she has been on methadone, **I think she is able to practice nursing with the requisite skill and safety** <u>provided she is monitored for a time to be determined by the Board</u>. She expressed an interest in participating in the VRP if that is possible.
>
> This opinion is provided within a reasonable degree of medical certainty and is based on the findings that are summarized above as well as on **data supporting the efficacy of methadone maintenance treatment for opioid dependence** (for a recent review see "Medication – Assisted Treatment for Opioid Addiction in Opioid Treatment Programs", Substance Abuse and Mental Health Administration, 2005), and could change following a review of new information.

Exhibit B at p. 5 (boldface added, underlining in original).

### D. In Spite Of Dr. Woody's Findings, Defendants Proceeded Against Reynolds, Required Her To Submit To The Recommendations Of A Clinic Opposed To Methadone, And Took Away Her License.

41. Following Dr. Woody's report, Reynolds received a letter dated October 5, 2006 from the Prosecution Division of the Office of Chief Counsel of the DoS stating that the DoS would "have [to] file formal charges" against Reynolds because Dr. Woody found that Reynolds would not be safe to practice without monitoring. The letter, from Margaret Sheaffer, Senior Prosecutor in Charge of the Prosecution Division, offered the possibility of settling the case via a consent agreement and enclosed a settlement agreement. A copy of the October 5, 2006 letter is attached hereto and incorporated herein by reference as Exhibit C. The letter did not state that Reynolds would be required to abstain from methadone in order to retain her license.

42. Reynolds signed the settlement agreement so that she could keep working, and because the settlement agreement did not state that she would be required to abstain from methadone. The BoN entered an order adopting the agreement on January 4, 2007. A copy of the settlement agreement is attached hereto and incorporated herein by reference as Exhibit D.

43. In fact, the settlement agreement set forth the very facts that demonstrate that Reynolds is a person with a disability, and that methadone maintenance is a reasonable accommodation for her disability. Specifically, the settlement agreement states that Reynolds "suffers from chemical dependency, specifically, opioid drug dependence, and is on methadone maintenance with evidence of excellent treatment response and generalized anxiety disorder, under adequate control with treatment." Consent Agreement and Order (Exhibit D hereto) at ¶3(i). *See also* Proposed Adjudication and Order dated August 10, 2007 (Exhibit E hereto) at pp. 12-13 ("The Respondent's position is understandable given her August 2006 evaluation from Dr. Woody which indicated that Respondent was opioid dependent, but indicated that

Respondent could practice the profession with appropriate monitoring and did not require that Respondent wean herself from Methadone as a condition precedent thereto.")

44. In the settlement agreement, the parties agreed, based on these facts including the fact that Reynolds was "on methadone maintenance with evidence of excellent treatment response," that Reynolds' license would be suspended for three years, but that the suspension would be "stayed in favor of no less than three (3) years of probation," subject to various terms and conditions. Consent Agreement and Order (Exhibit D hereto) at ¶¶ 5(a)-(b). The terms and conditions, set out in twelve pages, included requirements that Reynolds obtain an evaluation from a "PHMP-approved provider," comply with any treatment recommended by that provider, attend meetings at least twice per week in programs recommended by the provider, and obtain the provider's permission before practicing nursing.

45. The settlement agreement did not require that Reynolds be abstinent from methadone. Defendants did not inform Reynolds that as part of the implementation of defendants' exclusion policy, she would be assigned to a PHMP-approved provider, A Better Today, Inc., which uniformly and inflexibly required clients on methadone maintenance to be "detoxified" from and to abstain from methadone.

46. Thus, as part of defendants' exclusion policy, the so-called settlement actually had the purpose and effect of unlawfully requiring Reynolds to abstain from the very treatment, methadone maintenance, which made it possible for her to practice her profession.

47. The exclusion policy is unpublished, and has even been described as "secret" by some of defendants' agents. Despite repeated requests by Reynolds' methadone maintenance treatment provider NDTS for a copy of the exclusion policy, no such copy has been forthcoming. Yet defendants' agents have repeatedly acknowledged the existence of the exclusion policy and

have referred to the exclusion policy as the basis for the adverse and discriminatory actions that they have taken against Reynolds.

48. Even though the settlement agreement did not require that Reynolds abstain from methadone, Reynolds was unable to comply with the settlement agreement as implemented by defendants, by reason of defendants' selection of a provider that required clients to be "weaned" from methadone. *See* Proposed Adjudication and Order (August 10, 2007) (Exhibit E hereto) at p. 13 ("She also failed to comply with her evaluation treatment recommendation in that she has not entered inpatient treatment as recommended in order to be weaned from methadone.").

49. On August 10, 2007, the DoS Hearing Examiner issued a Proposed Order (Exhibit E hereto) which recommended among other things that Reynolds' license be suspended. On September 18, 2007, the Proposed Order became final. *See* Exhibit F hereto.

50. The Proposed Order and Final Order did not explicitly require that Reynolds abstain from methadone, but did require that Reynolds "provide[ ] the Board with an evaluation from a PHMP approved provider that she is safe to practice nursing in the Commonwealth." *See* Proposed Adjudication and Order (August 10, 2007) (Exhibit E hereto) at p. 16.

51. Defendants directed Reynolds to obtain the required evaluation from the same provider, "A Better Today," which they knew to be opposed to methadone maintenance treatment.

52. Defendants knew that Reynolds would not be able to obtain a satisfactory evaluation from "A Better Today" unless she was "weaned" from methadone.

53. On February 15, 2008, Reynolds' treating physician, Dr. William Santoro, who is Board-certified by the American Board of Addiction Medicine and experienced in the treatment of persons who suffer from the disability of opioid drug dependency, wrote to Pearl Harris, who

is a Case Manager in the PHMP assigned to supervise Reynolds' case.  A copy of Dr. Santoro's letter is attached hereto and incorporated herein as Exhibit G.

54. In his February 15, 2008 letter, Dr. Santoro described his conversation with the counselor from "A Better Today" who was assigned to Reynolds, and who insisted that Reynolds be weaned from methadone, even though the counselor also conceded that if Reynolds accepted such treatment, she "would, in all likelihood, resume illegal opiate use."  Thus, as part of their exclusion policy, defendants required Reynolds to submit to the treatment recommendations of a counselor who refused to permit Reynolds the very accommodation – methadone maintenance treatment – that would permit her to practice her profession safely and skillfully, notwithstanding her disability.

55. Dr. Santoro also stated in his February 15, 2008 letter that it was his "medical opinion that Melinda Reynolds should remain on her present medical treatment," that is on methadone maintenance treatment, "without interference," and warned of the "untoward outcomes" that would follow if Reynolds were compelled to discontinue this treatment.

56. In spite of Dr. Santoro's letter, defendants' Case Manager in the PHMP, Ms. Harris, wrote to Reynolds on March 13, 2008 and stated that her file had been "closed" until such time as "A Better Today" reported that she had been "weaned from methadone," thus confirming again the defendants' exclusion policy, and defendants' violation of Reynolds' rights under the ADA and the Rehabilitation Act.  A copy of Ms. Harris' letter is attached hereto and incorporated herein by reference as Exhibit H.

57. Because of defendants' exclusion policy, Reynolds is being unlawfully forced to choose between abandoning the treatment which her treating physicians have recommended for her disability, or abandoning her ability to practice her profession of nursing, even though

14

defendants' own expert, Dr. Woody, has declared that she is "able to practice with the requisite skill and safety."

58.     Reynolds is a widow with three children, two of whom are in college and all of whom are substantially dependent upon her earnings for their maintenance and support.

59.     The loss of Reynolds' nursing license, as a result of defendants' discriminatory policies and practices has caused Reynolds to lose income, and to experience pain and suffering as a result of both the loss of her status as a licensed professional, the diminution of her income, and her anxiety about being unable to support her family.

## COUNT ONE

### Declaratory Relief for Defendants' Violation of 29 U.S.C. §794 and 42 U.S.C. §12132

60.     Paragraphs 1 through 59 of this Complaint are incorporated herein by reference.

61.     Reynolds brings this action pursuant to 28 U.S.C. §§2201-2202, the Declaratory Judgment Act, to obtain a declaratory judgment concerning the legality of defendants' exclusion policy.

62.     There is an actual controversy between the parties with respect to the exclusion policy in that, as long as plaintiff continues to receive the methadone maintenance treatment that has been recommended by her treating physicians and which she reasonably believes that she requires as an accommodation to permit her to practice her chosen profession of nursing safely and skillfully, defendants will refuse to license her.

63.     Section 504 of the Rehabilitation Act, 29 U.S.C. §794, provides that "[n]o otherwise qualified person with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

15

64. Section 12132 of Title II of the ADA, 42 U.S.C. §12132, provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. As stated by the United States Court of Appeals for the Third Circuit in *New Directions Treatment Services v. City of Reading,* "This statement constitutes a general prohibition against discrimination by public entities, regardless of activity." 490 F.3d at 301.

65. Reynolds is a qualified person with a disability, within the meaning of both Section 504 of the Rehabilitation Act and Section 12132 of the ADA in that:

(a) She is a qualified by her training and experience to be licensed as a practical nurse ("LPN") and professional nurse ("RN").

(b) She has a past history in the 1970s and early 1980s of opioid drug dependency;

(c) She is under treatment, currently and since 1987 for endometriosis for which she has received lawful prescriptions for pain medication, and she has been prescribed ever-increasing amounts of the pain medications because of her endometriosis;

(d) Her past history of opioid drug dependency, and her current medical condition and treatment for endometriosis placed her at risk for use of illegal opioid drugs, a risk which can be minimized or avoided by methadone maintenance treatment; and

(e) When permitted to receive methadone maintenance treatment, she is able to practice her profession safely and skillfully and without posing any threat to others including patients and fellow workers.

66. Defendants' programs relating to licensing of nurses are programs receiving federal financial assistance within the meaning of Section 504 of the Rehabilitation Act, 29 U.S.C. §794.

67. Defendants are public entities within the meaning of Section 12132 of Title II of the ADA, 42 U.S.C. §12132.

68. Defendants' exclusion policy has resulted, is resulting and will continue to result in the denial of her participation in and denial of the benefits of defendants' services, programs and activities relating to licensing to practice as a nurse.

69. Defendants' exclusion policy constitutes discrimination by defendants against Reynolds by reason of her status as an individual with a disability.

70. The purpose and effect of defendants' exclusion policy is that any attempt by Reynolds to reinstate or activate her license or to become relicensed as a nurse is futile unless and until she discontinues the methadone maintenance treatment that has been recommended by her treating physicians, and that she requires as a reasonable accommodation in order to permit her to practice the profession of nursing with skill and safety.

71. Defendants' violation of Reynolds' rights under the Rehabilitation Act and the ADA to be free from discrimination based on her disability is a continuing violation, which affects her every day and which will continue to affect her. Reynolds is being denied licensing on a continuing basis because of her disability, and can only be relicensed if she abandons her right to a reasonable accommodation for her disability.

**COUNT TWO**

**Injunctive Relief for Defendants' Violation of 42 U.S.C. §12132**

72. Paragraphs 1 through 71 of this Complaint are incorporated herein by reference.

73. Reynolds has suffered, is now suffering and, unless defendants are enjoined and restrained from applying their exclusion policy to Reynolds, will continue to suffer irreparable harm for which she has no adequate remedy at law in that she will forced to choose between abandoning her chosen profession of nursing, or discontinuing the effective and reasonable treatment – methadone maintenance treatment – that allows her to practice her profession skillfully and safely.

**COUNT THREE**

**Damages for Defendants' Violation of 42 U.S.C. §12132**

74. Paragraphs 1 through 73 of this Complaint are incorporated herein by reference.

75. As a direct and proximate result of being compelled to relinquish her nursing license, Reynolds has suffered damages including but not limited to loss of income, pain and suffering in an amount in excess of $200,000.

WHEREFORE, Reynolds demands judgment against defendants as follows:

A. On Count One, for a declaration that defendants' exclusion policy is a violation of the ADA and the Rehabilitation Act and therefore void.

B. On Count Two, for an Order enjoining and restraining defendants, their officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them, or any of them, from:

(1) Refusing, directly or indirectly, to issue a nursing license to Reynolds because of her failure to comply with agreements or orders requiring her to cease receiving methadone maintenance treatment;

(2). Requiring Reynolds, as a condition to being licensed as a nurse, to submit to the recommendations of or obtain the approval of any party that requires methadone abstinence; and

  (3) For such other, further relief as may be required to effectuate the foregoing provisions.

C. On Count Three, for the damages which she has sustained.

D. For her attorneys' fees, interest and costs; and

E. For such other further relief as this Court shall deem just.

*/s/ Lawrence D. Berger*
_____
Lawrence D. Berger
Shepherd, Finkelman, Miller & Shah, LLP
35 East State Street
Media, PA 19063
(610) 891-9880 (phone)
(610) 891-9883 (fax)
LBERGER@sfmslaw.com (e-mail)
PA 16028

*/s/ Michael Churchill / LDB*
_____
Michael Churchill
Public Interest Law Center of Philadelphia
125 South 9th Street, Suite 700
Philadelphia, PA 19107
(215) 627-7100 (phone)
((215) 627-7183 (fax)
MChurchill@pilcop.org (e-mail)
PA 04661

Attorneys for Plaintiff

Dated: August 4, 2009