## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MELINDA LAMBERSON REYNOLDS,** | : | **No. 3:09cv1492** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **COMMONWEALTH OF** | : | |
| **PENNSYLVANIA;** | : | |
| **PENNSYLVANIA DEPARTMENT OF** | : | |
| **STATE;** | : | |
| **PENNSYLVANIA BUREAU OF** | : | |
| **PROFESSIONAL AND** | : | |
| **OCCUPATIONAL AFFAIRS;** | : | |
| **PENNSYLVANIA DIVISION OF** | : | |
| **PROFESSIONAL HEALTH** | : | |
| **MONITORING PROGRAMS;** | : | |
| **PENNSYLVANIA STATE BOARD OF** | : | |
| **NURSING;** | : | |
| **BASIL L. MERENDA;** | : | |
| **LINDA TANZINI AMBROSO;** | : | |
| **K. STEPHEN ANDERSON;** | : | |
| **CHRISTOPHER BARTLETT;** | : | |
| **RAFAELA COLON;** | : | |
| **KATHLEEN M. DWYER;** | : | |
| **JUDY A. HALE;** | : | |
| **SUZANNE M. HENDRICKS;** | : | |
| **JOSEPH J. NAPOLITANO;** | : | |
| **ANN L. O'SULLIVAN;** | : | |
| **JANET H. SHIELDS; and** | : | |
| **JOANNE L. SORENSEN;** | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Before the court is defendants' motion to dismiss plaintiff's amended complaint. Having been fully briefed and argued, the matter is ripe for disposition.

**Background**

This case arises out of Plaintiff Melinda Lamberson Reynolds's attempts to obtain a license as a registered nurse in the Defendant Commonwealth of Pennsylvania. Plaintiff was a licensed practical nurse ("LPN") and a professional nurse ("RN") in the Commonwealth for over fifteen years. (Amended Complaint (Doc. 9) (hereinafter "Complt.") at ¶ 1). She suffers from chronic opioid drug dependency. (Id.). Plaintiff cannot maintain her nursing license and/or has had her license suspended because defendants refuse to permit her to obtain methadone maintenance treatment for her drug dependency. (Id.).

Plaintiff alleges that methadone is a legal, synthetic opioid drug used medically as an anti-addictive medication for people suffering from chronic opioid drug dependency. (Id. at ¶ 9). The efficacy of methadone treatment, plaintiff contends, is well-established. (Id. at ¶ 10). Government agencies such as the National Institutes of Health and the Office of National Drug Control Policy have found methadone an effective means of reducing patients' cravings for illegal drugs. (Id. at ¶¶ 11-12). Moreover, methadone does not impair cognitive function or limit mental capability, intelligence, or the ability to maintain employment. (Id. at ¶ 13).

Plaintiff also alleges that opioid dependency is a disability within the meaning of the Americans with Disability Act ("ADA") and the Rehabilitation Act ("RA"). (Id. at

¶ 14(a)).  Methadone maintenance treatment, she insists, is a reasonable

accommodation for that disability, allowing opioid-dependent persons to perform the

essential functions of a job like nursing safely and skillfully.  (Id. at ¶ 14(b)).  Allowing

a person with an opioid dependency to use methadone maintenance as an

accommodation also does not pose a risk to the nurse's patients or fellow workers.

(Id. at ¶ 14(c)).

Plaintiff is qualified by training and experience to work as a licensed practical

nurse or a professional nurse.  (Id. at ¶ 15).  She was licensed for over 25 years as a

nurse, first in New Jersey and then in Pennsylvania.  (Id. at 18).   New Jersey

granted her an LPN license in 1980 and Pennsylvania in 1991.  (Id.).  In 2000, the

Pennsylvania Bureau of Nursing granted plaintiff an RN license.  (Id.).  Plaintiff is

also a person with a disability because: (a) she has a past history of opioid drug

dependency in the 1970s and 1980s; (b) she is not currently engaging in the illegal

use of drugs; (c) she is currently participating in a supervised rehabilitation program;

and (d) her past history of dependency and overall medical status places her at risk

of future illegal drug use, and this risk is minimized or avoided by methadone

treatment.   (Id. at ¶ 17).  Opioid dependency is a chronic condition, meaning that

persons like plaintiff are vulnerable to returning to drug use under stressful

conditions.  (Id. at ¶ 20).  In 1997, plaintiff became concerned that she would resume

her dependence on illegal opioid drugs, and sought treatment through methadone

maintenance so that she could continue her sobriety and employment as a nurse.

(Id. at ¶ 21).  Since 1997, plaintiff has received this therapy at various clinics.  (Id. at ¶ 24-25).  Plaintiff maintains that methadone is a safe and effective treatment, and that her performance as a nurse has not suffered during her methadone therapy. (Id. at ¶¶ 22-24).

Since 2004, plaintiff has received methadone maintenance treatment from New Directions Treatment Services ("NDTS") in Bethlehem, Pennsylvania.  (Id. at ¶ 25).  NDTS is accredited by the Commission on Accreditation and Rehabilitation Facilities pursuant to standards for methadone clinics promulgated by the United States Department of Health and Human Services.  (Id. at ¶ 26).  Under the NDTS program, plaintiff's methadone dose is given her directly by a nurse.  (Id. at ¶ 27).  She takes these doses both at the clinic and at home.  (Id.).  The nurse undertakes a weekly visual evaluation of plaintiff, and an NDTS employee evaluates plaintiff at least once a year.  (Id.).  She meets periodically with a counselor and is screened on-site for drug use on a regular basis.  (Id.).  Plaintiff has continued to work successfully as a nurse while being treated at NDTS.  (Id. at ¶ 28).  She has received many letters of recommendation from employers.  (Id. At 29).

Since at least 2005, defendants have followed an "unpublished but inflexible" policy of refusing to license or relicense as a nurse any person known to be participating in a methadone maintenance program.  (Id. at ¶ 30).  The defendants also refuse to approve any methadone provider as a Division of Professional Health Monitoring-Approved provider.  (Id.).  The exact terms of these exclusions are

4

unknown to the plaintiff, since the policy is an unpublished one. (Id. at ¶ 31). Still, the policy, which is followed by the defendants, their subsidiary and component agencies, their agents and employees and others participating with them, has the effect of unlawfully excluding plaintiff and others undergoing methadone treatment from being licensed as nurses. (Id.). The result of these programs is that plaintiff has been "wrongfully, arbitrarily and capriciously excluded" from licensing as a nurse. (Id. at ¶ 32).

Plaintiff also suffers from chronic hepatitis C. (Id. at ¶ 33). She began receiving treatment for this condition in 2005 in the form of legal prescription medications. (Id.). These medications, interferon and ribovarin, caused her to suffer from anemia and exhaustion. (Id.). Plaintiff also had a prescription for Ambien, a sleep aid. (Id.). In February 2005, plaintiff worked for a nurse staffing agency. (Id. at 34). While away from home, plaintiff forgot to bring her Ambien prescription with her and took another prescription sleep aid, Restoril, instead. (Id.). She borrowed the drug from her mother. (Id.). The next day, plaintiff was exhausted, and her supervisor requested that she submit to a drug test. (Id.). The screening showed she had taken Restoril. (Id. at ¶ 36). The tester reported this positive result to the state, though plaintiff's use of the drug was limited to the single occasion of her visit to her mother. (Id. at ¶ 37). Plaintiff was referred to the state's Voluntary Recovery Program, administered by the Bureau of Professional and Occupational Affairs. (Id.). On May 15, 2006, the Department of State filed with the Bureau of Nursing a

5

petition to require plaintiff to submit to mental and physical evaluation. (Id. at ¶ 38). The basis for this petition was that plaintiff had tested positive for the Restoril and been found eligible for a voluntary recovery program, but had not completed that enrollment. (Id. at ¶ 39). The Bureau of Nursing granted the petition, and plaintiff was ordered to undergo a mental and physical examination by George E. Woody, M.D. (Id. at ¶¶ 39-40).

Dr. Woody is a widely recognized authority on drug addiction. (Id. at ¶ 40). He examined plaintiff on July 20, 2006. (Id. at ¶ 41). During this examination, plaintiff told Dr. Woody about her addiction history and her current methadone treatment. (Id. at ¶ 42). Dr. Woody issued a report dated August 30, 2006 after his examination. (Id. at ¶ 43). This report concluded that plaintiff could "'practice nursing with the requisite skill and safety.'" (Id. at ¶ 44). Dr. Woody also found that plaintiff had responded positively to methadone maintenance. (Id.).

Despite these findings, the Bureau of Nursing initiated a proceeding against plaintiff designed to take away her nursing license. (Id. at ¶ 45). Plaintiff contends that this action was motivated by defendants' "inflexible methadone exclusion policy." (Id.). Defendants did not inform plaintiff that such a policy existed during the license suspension proceeding. (Id. at ¶ 46). Plaintiff alleges that defendants refused to consider methadone maintenance as an accommodation for plaintiff's disability during the license suspension proceeding, and that they refused to consider such treatment as an accommodation now. (Id. at ¶ 47). Board members never gave

plaintiff an opportunity "to gain consideration in the license suspension proceeding" for her disability and methadone as an accommodation for it. (Id. at ¶ 48). Plaintiff alleges that no current board members or other defendants are willing to consider restoring plaintiff's license and allowing her to treat her addiction with methadone maintenance. (Id. at ¶ 49).

Authorities initiated the license proceeding against plaintiff on October 5, 2006. (Id. at ¶ 50). On that date, the Prosecution Division of the Office of Chief Counsel of the Pennsylvania Department of State sent plaintiff a letter offering to enter into a settlement agreement. (Id.). Neither that letter nor a settlement agreement proposed to plaintiff contained any mention of a requirement that plaintiff abstain from methadone treatment. (Id. at ¶ 52). The only reference the settlement agreement made to methadone was a reference to Dr. Woody's finding concerning plaintiff's positive response to such treatment. (Id. at ¶ 53). The settlement agreement did require, however, that plaintiff be evaluated by and comply with any treatment requirements imposed by a "PHMP-approved provider." (Id. at ¶ 54). The defendants, however, have never approved any provider of methadone as an a PHMP-approved provider. (Id. at ¶ 55). They did not inform plaintiff–and she could not know–that only those providers who required abstention from methadone could be PHMP-approved. (Id. at ¶ 56).

Plaintiff signed the settlement agreement. (Id. at ¶ 57). She did so because the agreement allowed her to keep working, and did not state that she would be

required to quit using methadone maintenance. (Id.). The Bureau of Nursing entered an order adopting the agreement on January 4, 2007. (Id. at ¶ 58). The agreement stated that plaintiff "suffers from chemical dependency, specifically, opiod drug dependence, and is on methadone maintenance with evidence of excellent treatment response and generalized anxiety disorder, under adequate control with treatment." (Id.). At the same time, that agreement required plaintiff to comply with any treatment recommended by the PHMP-approved-provider, attend meetings twice a week in programs the provider recommended, and to obtain the provider's permission before practicing nursing. (Id. at ¶ 59).

The provider assigned to plaintiff, A Better Today, Inc., had a uniform and inflexible policy requiring patients using methadone maintenance to "detoxify" from and stop using methadone. (Id. at ¶ 60). Plaintiff alleges that the settlement agreement existed to serve defendants' methadone-exclusion policy, forcing plaintiff to forego a program that the settlement agreement itself recognized as effective. (Id. at ¶ 61). This policy of excluding methadone treatment is unpublished, and some state officials have described that policy as secret. (Id. at ¶ 62). Plaintiff's methadone treatment provider has repeatedly sought a copy of this exclusion policy from defendants, but no such policy has been provided. (Id. at ¶ 63).

On August 10, 2007, the Department of State Hearing Examiner issued a proposed order recommending that plaintiff's license be suspended. (Id. at ¶ 64). The order became final on September 18, 2007. (Id.). That order acknowledged

8

that the settlement agreement did not require plaintiff to discontinue her methadone treatment. (Id. at ¶ 65). Despite this acknowledgment, plaintiff alleges that she never had an opportunity to continue her methadone treatment and maintain her license, since the order required her to obtain treatment from a provider the defendants approved, and none of defendants' approved providers offer such treatment. (Id. at ¶ 66). Plaintiff insists that this lack of methadone treatment is a product of defendants' policy choices. (Id.).

Plaintiff alleges that this refusal of defendants to allow plaintiff simultaneously to obtain methadone maintenance and hold a nursing license is ongoing. (Id. at ¶ 69). Plaintiff's treating physician, Dr. William Santoro, wrote a February 15, 2008 letter to Pearl Harris, a PHMP case manager assigned to plaintiff's file. (Id. at ¶¶ 69-70). Dr. Santoro described a conversation with a counselor from the PHMP-approved treatment agency working on plaintiff's case. (Id. at ¶ 71). That counselor insisted that plaintiff be weaned from methadone, even though the counselor admitted that plaintiff would probably resume using illegal opiates if she stopped using methadone. (Id.). Dr. Santoro also wrote that he believed plaintiff should remain on her current course of methadone treatment and warned Harris of "'untoward outcomes'" that could come from stopping methadone. (Id. at ¶ 73).

On March 13, 2008, Harris wrote plaintiff to inform her that her case had been "closed" until the PHMP-approved provider reported that she had been "'weaned from methadone.'" (Id. at ¶ 74). Thus, plaintiff has been forced to choose between

abandoning a successful treatment for her addiction and ending her career as a nurse.  (Id. at ¶ 75).

Plaintiff filed a complaint in this court on August 4, 2009.  (See Doc. 1).  Defendants filed a motion to dismiss that complaint on October 5, 2009.  (See Doc. 7).  Plaintiff then filed an amended complaint, making the defendants' initial motion to dismiss moot.  (See Doc. 9).  The amended complaint raises three counts related to defendants' alleged violations of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, and the Rehabilitation Act (RA), 29 U.S.C.   Count one seeks a declaration from the court that defendants' policy of excluding from licensing nurses who are in a methadone maintenance prorgram violates the ADA and the RA.  Count II seeks injunctive relief for this alleged violation of federal anti-discrimination law.  Count III seeks damages for these violations.  Defendants then filed a motion to dismiss this amended complaint.  (Doc. 13).  The parties briefed the issue, and the court held oral argument, bringing the case to its present posture.

**Jurisdiction**

Because the case was brought pursuant to the ADA, 42 U.S.C. §§ 12101, *et seq.* and the RA, 29 U.S.C, § 794, the court has jurisdiction pursuant to 28 U.S.C. § 1331.   ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

**Legal Standard**

Defendants seek dismissal of the complaint pursuant to Federal Rule of Civil

Procedure 12(b)(6). When a defendant files a motion pursuant to Rule 12(b)(6), all well-pleaded allegations of the complaint must be viewed as true and in the light most favorable to the non-movant to determine whether "under any reasonable reading of the pleadings, the plaintiff may be entitled to relief." Colburn v. Upper Darby Township, 838 F.2d 663, 665-66 (3d Cir. 1988) (citing Estate of Bailey by Oare v. County of York, 768 F.3d 503, 506 (3d Cir. 1985), (quoting Helstoski v. Goldstein, 552 F.2d 564, 565 (3d Cir. 1977) (per curiam)). The court may also consider "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994) (citations omitted). The court does not have to accept legal conclusions or unwarranted factual inferences. See Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 133 (3d Cir. 2006) (citing Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997)).

The federal rules require only that plaintiff provide "'a short and plain statement of the claim showing that the pleader is entitled to relief,'" a standard which "does not require 'detailed factual allegations,'" but a plaintiff must make "'a showing, rather than a blanket assertion, of entitlement to relief' that rises 'above the speculative level.'" McTernan v. City of York, 564 F.3d 636, 646 (3d Cir. 2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555-56 (2007)). The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)

(quoting <u>Twombly</u>, 550 U.S. at 570).  Such "facial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the conduct alleged."  <u>Id.</u>

**Discussion**

Defendants seek dismissal of plaintiff's complaint on a number of grounds. The court will address each in turn.

### i. Abstention

Defendants first characterize plaintiff's claim as a collateral attack on an agency decision and argue that the court should abstain from hearing this case for the principles of federalism stated in <u>Younger v. Harris</u>, 401 U.S. 37 (1971), and the cases that followed.  They contend that plaintiff's complaint seeks to overturn a decision by a state administrative agency that was judicial in nature, involved important state interests, and provided plaintiff an opportunity to raise objections based on the ADA and RA.  Plaintiff contends that her complaint challenges the conduct of state officials, not state statutes, and is thus not barred by the abstention doctrine.  She challenges an unwritten policy of excluding methadone maintenance from approved treatment, and thus focuses on the conduct of officials, not the decision made by the Board of Nursing.  This anti-methadone policy is not part of the administrative procedures, and plaintiff seeks mainly prospective relief in preventing operation of that policy in the future.

"A federal district court has discretion to abstain from exercising jurisdiction

over a particular claim where resolution of that claim in federal court would offend principles of comity by interfering with an ongoing state proceeding." Addiction Specialists, Inc. v. Twp. of Hampton, 411 F.3d 399, 408 (3d Cir. 2005). Abstention, however, applies only "rarely," and only "in a few carefully defined situations." Id. (quoting Arkenbrandt v. Richards, 504 U.S. 689, 705 (1992); Gwynedd Properties, Inc. v. Lower Gwynedd Twp., 970 F.2d 1195, 1199 (3d Cir. 1992)). Three elements are required for Younger abstention to apply; "(1) there are ongoing state proceedings that are judicial in nature; (2) the state proceedings implicate an important state interest; and (3) the state proceedings afford an adequate opportunity to raise the federal claims." Id. The Supreme Court has extended this abstention doctrine to include civil cases, but only where "'the State's interests in the proceeding are so important that exercise of the federal judicial power would disregard the comity between the States and the National Government.'" Gwynedd Properties, Inc. v. Lower Gwynedd Township, 970 F.2d 1195, 1200 (3d Cir. 1992) (quoting Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 11 (1987)). Likewise, "[a]dministrative proceedings are also subject to Younger abstention." Zahl v. Harper, 282 F.3d 204, 208 (3d Cir. 2002).

The court finds that Younger abstention cannot apply to this case, as there are no ongoing state proceedings and the state court proceedings are final. In cases that arise from state proceedings which have "been reviewed extensively and with finality by the state courts" and where "there is no longer any state court action

13

pending or ongoing, resolution of the federal claims cannot impermissibly interfere with such state proceedings, so application of <u>Younger</u> is not appropriate." <u>Taliaferro v. Darby Twp. Zoning Bd.</u>, 458 F.3d 181, 192 (3d Cir. 2006); <u>see also</u> <u>Huffman v. Pursue, Ltd.</u>, 420 U.S. 592, 602 (1975) (finding that "a necessary concomitant of <u>Younger</u> is that a party in appellee's posture must exhaust his state remedies before seeking relief in the District Court, unless he can bring himself within one of the exceptions specified in <u>Younger</u>). Plaintiff here did not bring her case until she had no remedy available in state court; there is thus no reason for the court to avoid hearing the case on <u>Younger</u> abstention grounds. The motion will be denied on these grounds.

**ii. 11th Amendment**

Next, defendants claim that the Eleventh Amendment to the United States Constitution bars suit against the state and its agencies under the ADA in this matter.[1] The Eleventh Amendment provides that "the Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend XI. This prohibition

---

[1]Plaintiff brings her claims under both the ADA and the RA. The Third Circuit Court of Appeals has made it clear that Eleventh Amendment Immunity is unavailable under the RA, and defendants do not seek dismissal of the RA claims on those grounds. <u>See</u> <u>Bowers v. National Collegiete Athletic Association</u>, 475 F.3d 524, 545 (3d Cir. 2007) ("a state program or activity that accepts federal funds waives its Eleventh Amendment immunity in Rehabilitation Act claims.").

of suits against states applies "to suits by citizens against their own states." Board of Trustees of the Univ. of Alabama v. Garrett, 531 U.S. 356, 363 (2001). Such immunity is not absolute, but "there are only three narrowly circumscribed exceptions to Eleventh Amendment immunity: (1) abrogation by an Act of Congress, (2) waiver by state consent to suit; and (3) suits against individual state officials for prospective relief to remedy an ongoing violation of federal law." M.A. ex rel. E.S. v. State-Operated Sch. Dist., 344 F.3d 335, 345 (3d Cir. 2003). The issue here is whether Congress validly abrogated state sovereign immunity in the ADA. Thus, abrogation is valid when Congress: "(1) unequivocally expresses its intent to abrogate that immunity; and (2) act[s] pursuant to a grant of constitutional authority." Bowers v. NCAA, 475 F.3d 524, 550 (3d Cir. 2007).

The Supreme Court has found that Title I of the ADA, which prohibits discrimination in employment, does not validly waive state sovereign immunity. Id. at 374. The question here, however, involves Title II of that Act. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity.'" 42 U.S.C. § 12132. Plaintiff's claim alleges that she has been deprived or denied the benefits of a state program and the services of a state agencies through the PHMP's policy of preventing opiod addicts from utilizing methadone maintenance. Plaintiff cannot work as a nurse unless she is licensed by the board,

15

and the board will not provide her that license because of a policy plaintiff claims is discriminatory. As such, plaintiff has been denied the benefits and services of a public entity and has stated a claim on those grounds. See, e.g., Hason v. Medical Bd., 279 F.3d 1167, 1172 (3d Cir. 2002) (finding that "[t]he act of licensing involves the Medical Board (i.e. a "public agency") providing a license (i.e. providing a "service") to an applicant for a medical license."). The question here is whether sovereign immunity applies to plaintiff's Title II claims.[2]

Congress unequivocally expressed its intent to abrogate immunity in Title II of the ADA. See 42 U.S.C. § 12101(b)(4) ("[a] State shall not be immune under the eleventh amendment to the Constitution of the United States for an action in Federal or State court of competent jurisdiction."). The question here is whether that action was valid. The Supreme Court has found that Congress validly abrogated the States' 11th Amendment immunity in some circumstances, and that "Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress's § 5 authority to enforce the guarantees of the Fourteenth Amendment." Tennessee v. Lane, 541 U.S. 509, 533-34 (2004). Lane limited its holding to the question of access to the courts, however, and plaintiff's claim addresses a different type of discrimination. The question here, then, is whether discrimination in licensing on the basis of a plaintiff's disability is the

---

[2]The parties agree that plaintiff may seek injunctive relief against the individual defendants acting in their official capacities.

16

sort of violation for which Congress could validly abrogate sovereign immunity

pursuant to Section 5 of the Fourteenth Amendment.

In making such a determination, the court must first ask whether the conduct

described by the plaintiff was the sort of conduct that actually violates the Fourteenth

Amendment.   "'Section 5 authorizes Congress to create a cause of action through

which the citizen may vindicate his Fourteenth Amendment rights.'" United States v.

Georgia, 546 U.S. 151, 158 (2006) (quoting Lane, 541 U.S. at 559-60).  In these

circumstances, "insofar as Title II creates a private cause of action for damages

against the States for conduct that *actually* violates the Fourteenth Amendment, Title

II validly abrogates state sovereign immunity." Id. at 159 (emphasis in original).

Defendant argues that plaintiff cannot demonstrate an actual violation of the

Fourteenth Amendment by prevailing on her claim that denying her use of

methadone as a condition of working violates her right to equal protection of the law.

The Fourteenth Amendment's Equal Protection clause provides that "no State shall

"deny to any person within its jurisdiction the equal protection of the laws,' which is

essentially a direction that all persons similarly situated should be treated alike." City

of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (quoting Plyler v. Doe,

457 U.S. 202, 216 (1982)).  Section 5 allows enforcement of this provision, "but

absent controlling direction, the courts have themselves devised standards for

determining the validity of state legislation or other official action that is challenged

as denying equal protection."  Id. at 439-40.  Generally, "legislation is presumed to

be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." Id. at 440. "If, however, a State classifies on the basis of race, alienage or national origin or impinges upon a fundamental right such as the right to vote or the right to travel, the classification is subject to strict scrutiny analysis." Cochran v. Pinchak, 401 F.3d 184, 192 (3d Cir. 2005). Here, the alleged classification is on the basis of plaintiff's status as a dependent on narcotics; this is not a suspect class, and the rule need only pass the rational basis test. New Directions Treatment Services v. City of Reading, 490 F.3d 293, 301 (3d Cir. 2007); City of Cleburne, 473 U.S. at 436, 441-42.

In this case, the state's interest in licensing nurses involves insuring that health professionals are adequately trained and capable of performing their jobs in a way that promotes the health and safety of the population. That interest is surely legitimate. Requiring that those licensed by the state to perform such vital services are free of any chemical dependencies is rationally related to that desire to provide for public health and safety. While plaintiff may disagree about the defendant's alleged position on methadone, the treatment is controversial and the state could reasonably conclude that nurses should not use it. The court therefore finds that Congress did not validly abrogate state immunity for this conduct. While the court is sympathetic to the idea that methadone treatment can provide a means for opiod addicts to function successfully in society, the state is entitled to make an independent medical assessment of such treatment. The conduct here alleged does

not amount to an Equal Protection violation, and thus Congress did not validly abrogate state immunity for an actual 14th Amendment violation.

Courts have found, however, that Congress could still validly abrogate sovereign immunity without pointing to conduct actually violating the 14th Amendment, and the court must also analyze Title II under these circumstances. See, e.g., Bowers, 475 F.3d at 554 ("Having determined that the alleged misconduct in this case states a claim for violation of Title II but not the Fourteenth Amendment, we arrive at the final step of Georgia's tripartite test [which] requires [us] to determine whether Congress's purported abrogation of state sovereign immunity is nevertheless valid."). Though Congress's power to act under Section 5 is broad, "it is not unlimited." Id. at 551. Congress cannot act to "work 'a substantial change in the governing law.'" Id. (quoting City of Boerne v. Flores, 521 U.S. 507, 519 (1997)). Legislation passed pursuant to Section 5 "is valid if it exhibits 'a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'" Id. (quoting Lane, 541 U.S. 520). This "congruence and proportionality" test "requires [the court] to identify: (1) with some precision the constitutional right at issue; (2) whether Congress identified a history and pattern of unconstitutional discrimination by the States against the disabled; and (3) whether the rights and remedies created by the statute are congruent and proportional to the constitutional rights it purports to enforce and the record of constitutional violations adduced by Congress." Id.

Here, the right at issue, as in <u>Bowers</u>, is "the right to be free from irrational disability discrimination."  <u>Bowers</u>, 475 F.3d at 555.  Plaintiff contends that officials denied her the right to practice nursing because she is a drug addict who uses methadone to treat her condition.  Such treatment is not rational, she alleges, since methadone makes it possible for her safely to perform her job.  She contends that she was denied licensing as a nurse because of her use of methadone maintenance to treat her disability, and was thus treated differently than others seeking licensing.

Defendants argue that plaintiff's claim fails based on the second part of the "congruence and proportionality" test.  They insist that Congress did not develop a legislative record of discrimination in issuing and suspending professional licenses. Defendant cites to <u>Roe v. Johnson</u>, 334 F. Supp. 2d 415 (S.D.N.Y. 2004), for that proposition.  In <u>Roe</u>, the plaintiff suffered from depression when she filed an application for admission to the New York bar in July 2002.  <u>Id.</u> at 417.  After the bar's screening committee demanded information on plaintiff's medical condition, she sued claiming that the question on the screening form violated the Title II of the ADA.  <u>Id.</u> at 418.   The State of New York sought to have plaintiff's case dismissed on sovereign immunity grounds.  The district court granted this motion.  The court found that under <u>Lane</u>, Congress did not validly abrogate state immunity in the context of an application for admission to a state bar because Congress had not made a finding of "a pattern of state discrimination" in licensure and employment of individuals with disabilities, and "[t]here is therefore no basis to determine that Title

20

II, as applied to cases challenging a state's denial of admission to the bar, is necessary to enforce the Fourteenth Amendment in the face of an established pattern of state discrimination." Id. at 423. The court thus found "Title II, as applied to cases challenging a state's decisions concerning an applicant's admission to the bar, is an invalid exercise of congressional power under Section 5" of the Fourteenth Amendment and barred plaintiff from seeking damages against the state, state entities, or state actors in their official capacities. Id.

The court notes that Roe v. Johnson has only persuasive authority in this action. The court finds that defendants demand too narrow an interpretation of Congress's findings of a pattern of state discrimination; courts in this circuit have concluded that Congress found a broad swath of disability discrimination in the provision of state services when it enacted Title II. In Bowers, the Third Circuit Court of Appeals found that "[t]he Court in Lane concluded that Congress had clearly identified a history and pattern of disability discrimination with respect to public services." Id. In a footnote, the court noted that in Lane the Supreme Court "considered evidence of disability discrimination in a variety of public services, not just limited to access to the courts." Id. at 555 n.35. The Court had "referenc[ed] voting, serving as jurors, unjustified commitment, abuse and neglect of young persons committed to state mental hospitals, and irrational discrimination in zoning decisions." Id. Indeed, the court concluded that "[s]ubsequent decisions of the courts of appeals have recognized that the second prong of the Boerne test was

21

conclusively established with respect to Title II by the Lane Court." Id. Thus, the court concludes that Congress found a history and pattern of discrimination by the states in the provision of services to persons with disabilities, and thus met part two of the Boerne test. See, e.g., Cochran v. Pinchak, 401 F.3d 184, 188 (3d Cir. 2005) (agreeing with the finding that "'Title II in its entirety satisfies Boerne's step-two requirement that it be enacted in response to a history and pattern of States' constitutional violations.'") (quoting Miller v. King, 384 F.3d 1248, 1272 (11th Cir. 2004)).

The court must now determine whether "the rights and remedies created by the statute are congruent and proportional to the constitutional rights it purports to enforce and the record of constitutional violations adduced by Congress." Bowers, 475 F.3d at 551. Title II of the ADA provides in relevant part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132. As applied to state licensing and regulation of medical professionals, the remedies provided in Title II of the ADA are congruent and proportional to the problem of disability discrimination identified by Congress. Congress prohibits exclusion of and discrimination against people with disabilities in such areas, thus guaranteeing that qualified disabled people are not excluded from an opportunity to practice professions for which they have studied and trained. At the same time, the law does

not disrupt the ability of states to examine and license such professionals, and does not interfere with the state's interest in regulating the practice of medicine. Because the means chosen by Congress to address this problem are congruent and proportional to the discrimination identified by legislators, Congress validly abrogated state sovereign immunity in this area. The court will deny defendants' motion on those grounds.

### iii. Damages Against Individuals

Defendants also argue that the ADA and RA do not authorize damages against individuals, and that any claims for damages against the individual defendants must be dismissed. The Third Circuit Court of Appeals has found that "individuals are not liable under Titles I and II of the ADA, which prohibit discrimination by employers and public entities respectively." Emerson v. Thiel College, 296 F.3d 185, 189 (2002). As such, none of the individual defendants can be liable in their individual capacities for damages under Title II of the ADA, the provision of the statute under which plaintiff brings her claims. Moreover, the Court of Appeals has concluded that the RA applies only to entities which receive federal financial assistance for a program or activity; since an individual defendant does not receive such financial aid, individual defendants cannot be liable under the act. Id. at 190. Plaintiff therefore cannot recover damages under the RA against the individual defendants in their individual capacities. The court will therefore grant the motion on these grounds.

### iv. Quasi-Judicial Immunity

Defendants argue that the doctrine of quasi-judicial immunity bars plaintiff's claims against the individual members of the nursing board. Courts have concluded that some government officials enjoy a quasi-judicial immunity from suit. This doctrine holds that "government actors whose acts are relevantly similar to judging are immune from suit." Dotzel v. Ashbridge, 438 F.3d 320, 325 (3d Cir. 2006). Thus, "if a state official must walk, talk, and act like a judge as part of his job, then he is as absolutely immune from lawsuits arising out of that walking, talking, and acting as are judges who enjoy the title and other formal indicia of office." Id.

Defendant contends that plaintiff sues the individual defendants on the basis of their decision to suspend her from nursing, which was an administrative decision made in the defendants' capacities as members of the Nursing Board. As such, the decision is the sort of adjudicatory finding that entitles defendants to quasi-judicial immunity. Plaintiff responds that the allegations against these defendants are directed not at their decision to suspend plaintiff, but at their formulation of a policy that plaintiff contends discriminates against her.

The court agrees with the plaintiff. Taking all the plaintiff's allegations in the light most favorable to her, she alleges that defendants formulated a policy designed to deny anyone on methadone maintenance a nursing license. The lawsuit is about the formulation of this policy, not the decision to suspend plaintiff because of it. While plaintiff will have to demonstrate after discovery that the defendants actually

created this policy, at this point in the litigation plaintiff's allegations are sufficient to survive a motion to dismiss. The court will deny the motion on these grounds.

### v. Defendant Merenda

Finally, defendants insist that plaintiff's complaint does not identify Defendant Basil L. Merenda other than to identify him as a party. As such, plaintiff has not stated a claim against this defendant, and he should be dismissed from the case. Plaintiff responds that she has identified Commissioner Merenda as Commissioner of the Pennsylvania Bureau of Professional and Occupational Affairs, the agency she alleges established the policy excluding methadone patients from licensing, and thus as the author of the policy about which she complains.

The court agrees with the plaintiff. While her complaint could be more precise, plaintiff does allege with sufficient particularity that Defendant Merenda is one of the authors of the policy about which she complains. While discovery may reveal that the policy does not exist, or that Merenda had nothing to do with its development, at this point in the litigation plaintiff has sufficiently alleged that the Merenda drafted a policy designed to discriminate against her because of her disability. The court will deny the motion on this point.

## Conclusion

For the reasons stated above, the court will grant the motion in part and deny it in part. The court will grant the motion as it relates to damages against the individual defendants under the ADA and RA; damages are available under those

acts, however, from the Commonwealth. The motion is denied in all other respects.

An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MELINDA LAMBERSON REYNOLDS, | : | No. 3:09cv1492 |
| **Plaintiff** | : | |
| | : | (Judge Munley) |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA; | : | |
| PENNSYLVANIA DEPARTMENT OF | : | |
| STATE; | : | |
| PENNSYLVANIA BUREAU OF | : | |
| PROFESSIONAL AND | : | |
| OCCUPATIONAL AFFAIRS; | : | |
| PENNSYLVANIA DIVISION OF | : | |
| PROFESSIONAL HEALTH | : | |
| MONITORING PROGRAMS; | : | |
| PENNSYLVANIA STATE BOARD OF | : | |
| NURSING; | : | |
| BASIL L. MERENDA; | : | |
| LINDA TANZINI AMBROSO; | : | |
| K. STEPHEN ANDERSON; | : | |
| CHRISTOPHER BARTLETT; | : | |
| RAFAELA COLON; | : | |
| KATHLEEN M. DWYER; | : | |
| JUDY A. HALE; | : | |
| SUZANNE M. HENDRICKS; | : | |
| JOSEPH J. NAPOLITANO; | : | |
| ANN L. O'SULLIVAN; | : | |
| JANET H. SHIELDS; and | : | |
| JOANNE L. SORENSEN; | : | |
| **Defendants** | : | |

## ORDER

**AND NOW**, to wit, this 21st day of June 2010, the defendants' motion to dismiss the amended complaint (Doc. 13) is hereby **GRANTED** in part and **DENIED** in part, as follows:

1) The motion is **GRANTED** with respect to plaintiff's claims for damages against the individual defendants pursuant to the Americans with Disabilities Act and the Rehabilitation Act; and

2) The motion is **DENIED** in all other respects.

**BY THE COURT:**


**s/ James M. Munley**
**JUDGE JAMES M. MUNLEY**
**UNITED STATES DISTRICT COURT**