## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BEVERLY LAMBERSON, as Administratrix of the Estate of Melinda Lamberson Reynolds, Deceased,** | **CIVIL ACTION NO. 3:09-cv-1492** |
| **Plaintiff** | **(Judge Munley)** |
| **v.** | |
| **COMMONWEALTH OF PENNSYLVANIA, *et al*., Defendants** | **Electronically Filed** |

## DEFENDANTS' STATEMENT OF MATERIAL FACTS

Defendants, pursuant to Local Rule 56.1, hereby set forth the following material facts as to which they contend there is no genuine issue to be tried:

### I. Reynolds' Treatment History 1997-2005.

1.     On October 2, 1997, Reynolds enrolled in a methadone maintenance program operated by Morris County After Care Center.  She continued to receive treatment there until approximately February 2004.  Morris County Aftercare Records, MLR 17766.

2.     The Physician's and Nurse's Progress Notes dated October 2, 1997 state that Reynolds had been "addicted to heroin for 20 years off and on." Morris

County After Care Records, MLR 17764.  Reynolds' "Drug History" form also indicates 20 years of heroin use.   Morris County After Care Records, MLR 17761.

3.      In the same drug history form, under "Other Drugs used," is listed Xanax. *Id*.

4.      The noted impression at her intake was "heroin addiction."   Morris County After Care Records, MLR 17768.  The original recommendation appears to be "methadone maintenance."   However, the word "maintenance" was scratched out and replaced with "detox – x 90 days." *Id*.  Reynolds signed a methadone detox agreement.  Morris County After Care Records, MLR 17760.

5.      On June 4, 2003, a doctor's order sheet notes that "Benzo's given by psychiatrist."  In the same note it states that Reynolds was "[a]dvised to try to get off Benzos."  Morris After Care Records, MLR 17656.  On August 18, 2003, Reynolds was advised to enter an inpatient detox program for benzodiazepines. The note further stated, "Numerous personal problems including recently arrested for CDS [controlled dangerous substance] possession.  Thrown out of house by husband, family distancing themselves from her.  Adv. strongly to go inpatient long term detox." *Id*.

2

6.     On August 22, 2003, a note made at Reynolds' annual evaluation stated that she will be admitted to St. Claire Hospital medical unit in Dover "for detox from benzodiazepines."    Morris County After Care Records, MLR 17657.

7.     According to another note dated October 6, 2003, Reynolds entered a detox program at St. Claire Hospital for 11 days and was "successfully detoxed from Benzo."  She was discharged on September 28, 2003.  Morris County After Care Records, MLR 17662.

8.     Reynolds was employed as a staff nurse at the Pocono Medical Center for 2 ½ years with her last day of work August 24, 2003.  Pocono Medical Center Employment Records, MLR 19841.

9.     Reynolds was discharged  from her position with Pocono Medical Center on August 14, 2003 for the following reasons: (1) she failed to dispense medications to several patients as directed by her employer; (2) she failed to complete patient charts in accordance with her employer's policy; (3) she did not show up for work and failed to call off work on August 10, 2003, and August 14, 2003; (4) she reported off work from on August 15, 2003, and then, when rescheduled to work another shift, failed to show up for work and failed to call off work.   Pocono Medical Center Employment Records, MLR 19861-19863.

10.     In the written determination of the unemployment compensation hearing officer, it states that Reynolds claimed that she forgot.  Pocono Medical Center Employment Records, MLR 19844.

11.     On March 29, 2004, Reynolds enrolled in the methadone maintenance program at New Directions Treatment Services ("NDTS").  NDTS Records, MLR 18400.

12.     Methadone maintenance clinics are not licensed to treat pain. Limoges Report at 5.

13.     While Reynolds was enrolled in NDTS her urine tests came up positive for opiates on July 1, 2004, NDTS Records, MLR 17772, and July 10, 2008.  NDTS Records, MLR 17777.

14.     While Reynolds was enrolled in NDTS her urine tests came up positive for cocaine on August 2, 2007, August 16, 2007, and September 13, 2007. NDTS Records, MLR 17776.  In a discharge summary dated September 21, 2010, Hightower notes that the "patient never produced urine screens for illicit opiate usage.  However there were a few slips with cocaine usage which patient denied a few and acknowledged a few.  NDTS Records, MLR 18389.

15.     On July 29, 2008, Bendiner & Schlesinger, Inc. Medical Laboratories reported that Reynolds' July 11, 2008 specimen was confirmed positive for Hydrocodone.  NDTS Records, MLR 17945.

16.     On November 10, 2010, Bendiner & Schlesinger, Inc. Medical Laboratories reported that Reynolds' September 23, 2010, specimen was confirmed positive for Oxycodone and Oxymorphone.  NDTS Records, PMLR 417-18.

17.     On November 15, 2010, Bendiner & Schlesinger, Inc. Medical Laboratories reported that Reynolds' October 21, 2010, specimen was confirmed positive for Morphine.  NDTS Records, PMLR 416.

18.     On June 28, 2011, Bendiner & Schlesinger, Inc. Medical Laboratories reported that Reynolds' May 26, 2011, specimen was confirmed positive for Morphine.  NDTS Records, MLR 17884.

19.     On April 9, 2004, Reynolds had her first meeting with her counselor, Monique Hightower at NDTS.  In her assessment of Reynolds that day, she wrote, "Clients [sic] seems to [sic] willing to participate in treatment and observe the rules and regulations of the agency.  While collecting data for the psycho social history I noticed that the client became uncomfortable when talking about her drug, and was very vague with her answers, and information."  NDTS Records, MLH 18576.

20.     On April 12, 2004, Hightower's assessment states, "Client seems to be vague when disclosing information regarding her family history and past experiences with drugs.  She also seems to minimize her use and make light of it. Client is guarded and is feeling out her therapy session."  NDTS Records, MLH 18576.

21.     In Hightower's Psychosocial Evaluation of Reynolds of April 29, 2004, Hightower identified "Benzo addiction" as one of Reynolds' underlying problems.  NDTS Records, MLR 18442.

22.     A written case consultation note of June 7, 2004, states, "Presently, client continues to use benzo's without the support of a treating psychiatrist.  As a result client has earned no take outs and continues to work limited hours." Georgina Miller, clinical director, and Monique Hightower attended the consultation.  NDTS Records, MLR 18586.

23.     In a note dated August 2, 2004, Hightower writes, "Client reports that her family doctor who prescribes her benzo's refused to speak with our medical director confirming her benzo use while on methadone.  Additionally, client reports that her doctor may not continue prescribing her medication due to client withholding information about drug history and her current participation in treatment.  Client reports that she has no other choice but to detox from methadone

because she is unable to comply with requirements made at her face to face meeting due to financial restraints." NDTS Records, MLR 18573.

24.     In a summary of client's progress note dated August 29, 2004, Hightower states, "Mrs. Reynolds continues to remain opiate free but continues to dependant [sic] on benzo's, in order to control her symptoms of anxiety." The note goes on to say that Reynolds would like to focus on detoxing off benzos. NDTS Records, MLR 18532.

25.     In a summary of client's progress note dated October 29, 2004, Hightower notes that Reynolds' "benzo use is now being monitored by our program doctor for a successful detox, who is simultaneously treating her anxiety." NDTS Records, MLR 18530.

26.     In the summary of client's progress note dated December 29, 2004, Hightower states that "client has successfully detoxed off of benzo's." NDTS Records, MLR 18528.

27.     On February 3, 2005, Deborah J. Wilson, DO, stated in her case notes: "[I] [d]id tell her I was aware she supplemented benzo use during detox. She admitted she had. She feels she doesn't abuse benzos and uses then for her anxiety. Reminded that her detox period was when we were to adjust medications to control her anxiety so she could get off benzos. Supplementing, misleading

7

answers to questions is an addictive behavior NOT an anxiety behavior.  Told her that we would not redo a detox nor approve use of benzos for her." NDTS Records, MLR 17969.

28.     In an addendum entered the same day, Dr. Wilson stated:  "Spoke to Dr. Vellaluz briefly regarding scenario.  She indicates that a person using 10 mg a day Xanaz is not using it for therapeutic reasons." *Id.*

29.     In Reynolds' Physical and History Examination taken on February 14, 2005, it is noted that Reynolds "[h]ad been benzo detoxed by Dr. Wilson, but resumed use. Admitted to Dr. Wilson she had been supplementing during detox. Pt appears under the influence today."  NDTS Records, MLR 17938.  Also, on February 14, 2005, Reynolds received notice that "due to (5) consecutive positive urines, you are now on Program Probation."  NDTS Records, MLR 18726.

30.     In the February 28, 2005, summary of client's progress note, Hightower writes, "Although client was detoxed off of benzo she has returned to her benzo use." NDTS Records, MLR 18526.

31.     On March 1, 2005, NDTS sent Reynolds a notice stating that, "It is our determination that you are not ready, willing or able to respond to this level of care.  Therefore, beginning on the date of Fri. 3/4/05 you will be placed on and begin a mandatory detox from this program.  The detox will last for 21 days

8

followed by a discharge for non-compliance with treatment expectations." NDTS

MLR 18725. She was given the notice of the 21-day detox for "non compliance

with treatment, specifically drugs, on 2/23/05." NDTS Records, MLR 18724.

32.    Reynolds appealed this decision to the multi-disciplinary team and

met with the team on March 3, 2005. NDTS Records, MLR 18724.

33.    On March 3, 2005, the team reversed the decision and, instead,

directed Reynolds to Cedar Point Family Services, a division of New Directions

Treatment Services, for treatment of her

34.    anxiety disorder. *Id*.

35.    On March 15, 2005, Reynolds began her treatment at Cedar Point

Family Services. In a Psycho Social History and Evaluation form, Reynolds'

symptoms or disabilities are describes as: "Symptoms of anxiety, panic attacks,

hyperactivity, insomnia. Impairments include being less aware in the daytimes,

more groggy. Tired in the afternoon. Has trouble concentrating when anxious.

Feels ill and shaky when having panic attacks. Cedar Point Records, MLR 21076.

36.    In the same form, the "Events or incidents leading to need for

services" section described as "Use of benzodiazepines to manage anxiety lead

[sic] to her referral for mental health services." *Id*.

37.     While Reynolds was an inpatient at Cedar Point Services, a note dated July 8, 2005, states, "Melinda discussed her increased depression and anxiety in reaction to having to come to the methadone program every day after losing her take outs following the Clinic's finding out the she had been using Zanax [sic] from a doctor outside clinic without first getting permission." Cedar Point Records,  MLR 21100.

38.     Reynolds was discharged form Cedar Point Family Services on November 22, 2005.  The reason given for discharge was "non-compliance with appts., no response to letter inquiring about interest in services." Cedar Point Records, MLR 21051.

39.     In an August 17, 2005, file note written Hightower states:  "I explained to client her urine have been coming back positive for Xanax and she has been approved for Klonapin only.  I explained her next urine would come back positive and she would be losing her take outs as a result.  Additionally Dr. Vellaluz will be informed.  When asked about the Xanax use client had very little to say."  Hightower later in the same note states:  "Seemingly client did not count on the urine to break down the types of Benzo and has been taking then for a while for them to show up in your system."  NDTS Records, MLR 18564.

40.     An August 24, 2005, file note written by Hightower:  "Additionally she is exhibiting addictive behaviors by not informing her treating psychiatrist about the additional Xanax she is taking."  NDTS Records, MLR018564.

41.     In the August 31, 2005, summary of client's progress note, Hightower writes, "Mrs. Reynolds continues to remain opiate free.  However, client continues to struggle with recurring benzo use."  NDTS Records, MLR 18520.

42.     On September 8, 2005, Candice S. Cerracchio of Gastroenterology Associates, Ltd. wrote to Dr. William Santoro of NDTS about Reynolds' Xanax prescription, "and that there is a general disapproval of benzo's being used."  Ms. Cerracchio notes that when the Xanax was first prescribed, "this office was unaware of her [Reynolds'] involvement in your program."  Ms. Cerracchio concludes by saying, "All in all, it does appear that although unfortunately, Xanax may not be the best medication for someone with a history like Malinda [sic], if it is what is necessary to get her through this treatment, and in the absence of her abuse of the medication, I do continue to feel that the benefit from eradicating the virus from her system, far outweighs the risk of harm of her taking Xanax, even with her history of addictions."  NDTS Records, MLR 18375-18377.  On one copy of the letter is a hand written note stating, "Excuse the Benzo use and follow closely." NDTS Records, MLR 18377.

11

43.     On October 21, 2005, Hightower entered a note stating:  "Additionally we spoke about the clients behaviors to medicate self with family members medication as a result of having a headache and so forth and agreed this was not appropriate behavior for living a sober life and for maintaining a clean licenses which is her lively hood."  NDTS Records, MLR 18562.

44.     In the October 31, 2005, summary of client's progress note, Hightower notes that Reynolds "has been approved by the medical director to take Xanax for her anxiety and the anxiety produced by her liver treatment…."  NDTS Records, MLR 18518.

**II. Board Proceedings**

45.     The Professional Health Monitoring Program (PHMP) is a division within the Bureau of Professional and Occupational Affairs which provides a means for licensed professionals who suffer from chemical dependence and other impairments to be directed to appropriate treatment and receive monitoring to ensure that they can safely practice their licensed profession.  The program is comprised of two units: the Voluntary Recovery Program (VRP) and the Disciplinary Monitoring Unit (DMU).   Harris Deposition 13.

46.     Individuals voluntarily enter the VRP and are monitored according to an agreement entered into between the participant and the PHMP.  Licensees enter

the DMU either by a medical board approved consent order or by an adjudication of a board. DMU participants are strictly monitored according to the terms and conditions of the consent order or the adjudication. Harris Dep. 11-12, 13, Exhibit at 24.

47.     On or about February 18, 2005, the complaints office of the Department of State received a complaint from Reynolds' then employer, InteliStaf Healthcare. The letter stated that a urine specimen provided by Reynolds tested positive for benzodiazepines. At the time, Reynolds was working in SCCI, a long-term acute care facility in Easton, PA. Harris Deposition 68-69, 71-72, Exhibit P-9; Reynolds PHMP File, MLR 1067.

48.     The letter stated that on February 10, 2005, Reynolds had voluntarily submitted to a for-cause drug screening. Harris Deposition Exhibit P-9; Reynolds PHMP File MLR 1067.

49.     Reynolds's former employer, InteliStaf Healthcare, had the test performed because Reynolds displayed erratic behavior and there were incidents in which Reynolds "occasionally nodded off" and "her charting was illegible, incorrect, or missing altogether." Harris Deposition 68, Exhibit P-9; Reynolds PHMP File MLR 1067.

50.     On February 24, 2005, the letter was forwarded to PHMP.  Harris

Deposition Exhibit P-9.  On the same day, Pearl E. Harris, a case manager for

PHMP filled out a "Scratch Sheet," which noted the information on the complaint

from Intelistaff and also stated "benzo" as the drug of choice/abuse.  Harris

Deposition Exhibit P-10.

51.     On March 1, 2005, Harris sent a letter to Reynolds informing her that

information had been received indicating she may be suffering from an

impairment.  The letter stated that the VRP offered Reynolds the opportunity to

receive assessment and treatment if necessary without public action by the State

Board of Nursing.  The letter also provided information as to how Reynolds could

be enrolled in the VRP.  Among other matters the letter stated that Reynolds

should complete and return an enclosed Participant Cooperation form and a

Personal Data Sheet and schedule an appointment with Kathy Toothill for an

evaluation. Harris Deposition Exhibit P-9.

52.     When Reynolds did not respond to the March 1, 2005, letter, Ms.

Harris sent Reynolds a second letter dated May 23, 2005, again inviting Reynolds

to participate in the VRP.  This letter restated the steps Reynolds was to take but

did not specify Kathy Toothill as the evaluator but, rather stated that in order to

participate in the program Reynolds would need an evaluation by a VRP-approved provider.  Harris Deposition Exhibit 11.

53.     Sometime after Pearl E. Harris sent the letter of March 1, 2005, Harris Deposition Exhibit P-9, Reynolds called Harris and told her that Kathy Toothill was not available to do the evaluation and that the only other drug and alcohol treatment facility Reynolds knew in her area was A Better Today.  Reynolds stated that she would like to have her evaluation done there.  Harris Deposition 78-79.  This change of evaluator was noted on the "scratch sheet." Harris Deposition Exhibit 10.

54.     On September 7, 2005, Harris received a letter from A Better Today stating that Reynolds had been given a drug and alcohol evaluation on June 14, 2005.  The letter stated that "based on the information given by this individual at this time, she was deemed appropriate for Outpatient Treatment two times weekly."  The letter further indicated that she had attended six of sixteen scheduled treatment sessions to date.  (The letter clearly mistakenly refers to Reynolds as "Ms. Harris.")  Harris Deposition 86-87, Exhibit P-12.

55.     On October 6, 2005, Reynolds completed a Participation Cooperation form and Personal Data Sheet in which she voluntarily agreed to comply with the requests outlined in the letter.   By signing the form Reynolds also verified that

statements she made in the Personal Data Sheet were true and correct to the best

of her knowledge. Harris Deposition Exhibit 14.

56.     In the Personal Data Sheet, when asked to provide "a brief history of

the course and symptoms of my chemical dependency/abuse," Reynolds stated, "I

freely choose to take a prescribed sleeping agent (Restoril 15 mg ɨ) that I got from

my mother.  I had an Rx for ambien that I did not have with me at the time." Harris

Deposition Exhibit 14; Reynolds PHMP File, MLR 1057.  Elsewhere in the same

document, Reynolds stated that "I suffer from medicating self with restoril 15 mg

tabs mg ɨ due to the fact that I had a prescription which I did not have with me."

Harris Deposition Exhibit 14; Reynolds PHMP File, MLR 1056.

57.     On October 7, 2005, Harris sent Reynolds a letter notifying her that

her VRP file had been closed and that it would be "forwarded to the Legal

Division of the Bureau of Professional and Occupational Affairs to review

regarding initiation of formal public disciplinary procedures against your license

to practice by the Pennsylvania State Board of Nursing.  Reynolds PHMP File,

MLR 1027.

58.      On November 16, 2005, Harris received a letter from A Better Today

advising her that "Ms. Reynolds has been Therapeutically Discharged as of

October 28, 2005, due to non-compliance with treatment attendance requirements." Reynolds PHMP File, MLR 1048.

59.     Reynolds was never formally enrolled in the VRP because she did not return certain requested paperwork by the deadline set by the VRP.  *See* Reynolds PHMP File,  MLR 1035.

60.     In her VRP Personal Data Sheet, in response to its request to list all currently prescribed medications, Reynolds listed only the following medications: Copegus, Pegasys, Epogen, Restoril, and Xanax. Harris Deposition Exhibit 14.

61.     In the VRP Personal Data Sheet that Reynolds signed on October 6, 2005, and mailed to the VRP, Reynolds did not (1) disclose all drug and alcohol treatment she received in the past; (2) state that she was receiving methadone maintenance; (3) provide information of any current or past criminal action that had been taken against her; or (4) provide a complete history of her drug use, including her heroin use. Harris Deposition Exhibit 14.

62.     On May 22, 2006, the State Board of Nursing ordered Reynolds to have an evaluation by George E. Woody.  NDTS record, MLR 18362-18367.  Dr. Woody conducted that evaluation on July 20, 2006.  Woody Record, MLR 17036.

63.     The examination found that Reynolds suffered from opioid dependence but that she could practice nursing "provided she is monitored for a

time to be determined by the Board."   This condition was emphasized by underlining.  Woody Record, MLR 17040.   The report does not mention Reynolds' dependence of benzodiazepines.

64.     In the section of Dr. Woody's Report entitled "History of the Problem as Provided by Ms. Reynolds and the Medical Records," there is no mention of Reynolds' prior treatment history at Saint Clare's Hospital or Morris County After Care Center; the date on which she began methadone maintenance treatment; her 20 year history of heroin, her history of benzodiazepine use; and her prior detoxification from benzodiazepines.  Woody Record, MLR 17036-17040.

65.     Because Dr. Woody had stated that there was a need for monitoring, and because Reynolds did not enroll in the Voluntary Recovery Program, the Commonwealth filed an Order to show Cause directing Reynolds to show cause why her license should not be suspended, revoked or otherwise restricted.  Board Proceedings, MLR 22342-22348.

66.     Reynolds never answered the charges but, instead, settled the proceeding by entering a Consent Agreement and Order.  Under the terms of the agreement, a finding of a violation of the consent order would result in the suspension of Reynolds's license.  Board Proceedings, MLH 22391-22410.  The agreement permitted Reynolds to continue to practice on a probationary status

provided she complied with its terms.  *Id.*   Reynolds was represented by counsel at the time she signed the agreement.  Board Proceedings, MLR 22411. The Board adopted the consent order on January 4, 2007.  *Id.*

67.   Under the agreement, Reynolds was obligated to provide written verification of support group attendance, submit to random drug tests as directed by PHMP, arrange to have forwarded to PHMP a copy of her approved evaluation, and pay all costs incurred in complying with the terms of her Consent Agreement. Board Proceedings, MLH 22391-22410.

68.   The DMU consent agreement provided that Reynolds's nursing license would be subject to an act of suspension of up to three years for violating the terms and conditions of her probation.  *Id.*

69.   On January 22, 2007, Ms. Pearl Harris, PHMP Case Manager, sent a letter to Reynolds informing her that the DMU had been assigned to monitor her compliance with the January 4, 2007 Board Order.  Along with the January 22, 2007 letter, Reynolds received the DMU Personal Data Sheet, PHMP's support group attendance sheets, and information relative to enrolling in PHMP's drug testing program.  The letter re-stated Reynolds' obligations under the agreement to forward a copy of a provider's evaluation to PHMP, to attend support group

meetings and document that attendance, and to submit to Random Observed Bodyfluid Screens.  Reynolds PHMP File, MLR 891-892.

70.     On February 2, 2007, Reynolds signed the DMU's Personal Data Sheet verifying that the statements she made in the Personal Data Sheet were true and correct to the best of her knowledge.  Reynolds PHMP File, MLR 940-948.

71.     In statements made in her DMU Personal Data Sheet signed on February 2, 2007, and mailed to the DMU, Reynolds (1) denied that any current or past criminal action had been taken against her; (2) did not provide information about her prior Heroin use; (3) did not provide information that her methadone maintenance began in 1997, and instead stated that she started her methadone maintenance in 2004.  *Id.*

72.     Pearl Harris again referred Reynolds to A Better Today for evaluation. Reynolds never made a request for another provider.  Harris Deposition 219.

73.     On July 11, 2007, Vincent Carolan of A Better Today wrote to Harris. He stated that based on his assessment of Reynolds, he identified her current diagnosis as opioid dependence and benzodiazepine dependence.  Reynolds PHMP File, MLR 967.

74.     Carolan also stated, "Based on the physiological nature of her current ongoing dependence to Xanax and Methadone, Ms. Reynolds was directed to enter

into a level 3A Medical Detoxification Unit before being admitted to out-patient therapy with A Better Today.  Ms. Reynolds agreed to enter a facility arranged for by A Better Today.  Although this process was agreed upon and facilitated, Ms Reynolds failed to follow through and made repeated calls to ABT in which she sounded impaired.  Ms. Reynolds and ABT discontinued the unsuccessful clinical process on 1/31/07." *Id*.

75.     On March 5, 2007, Ms. Harris, Reynolds's DMU Case Manager, sent a letter to Reynolds notifying her of the following instances of non-compliance with her Board Order:  "failing to provide Release of Information and other related materials in reference to your Evaluation & Treatment.  Failure to set-up and provide ROBS; failure to provide Support Group Verification Sheets since entering the Program in January, 2007 and failure to ensure that written reports were sent to this Office by your Employer and Treatment Providers."  Reynolds PHMP File, MLR 890.

76.     On April 24, 2007, Ms. Harris, sent a letter to Reynolds notifying her that her violations of her Board Order were reported to the Prosecution Division. Reynolds PHMP File, MLR 882.  On the same day, Harris sent a memo to Heidy Weirich, Complaints, outlining Reynolds' violations of the Consent Order. Reynolds PHMP File, MLR 881.

77.    On May 9, 2007, the Commonwealth submitted a Petition for Appropriate Relief to the Probable Cause Screening Committee of the State Board of Nursing (Board Committee) in accordance with the procedure set forth in the Consent Agreement and Order.  Board Proceedings, MLR 22386-22389.

78.    The petition alleged that Reynolds violated the terms of the consent agreement by, among others, failing to begin submission of her body fluid toxicology screens, failing to submit written verification that she attended support group meetings, failing to submit an assessment by a PHMP-approved provider and failing to comply with treatment recommendations from her provider in that she had not entered inpatient treatment to be weaned from methadone.  Board Proceedings, MLR 22387-22388.

79.    The Board Committee issued a Preliminary Order on the same day suspending Reynolds' license to practice nursing subject to her right to defend the allegations by filing an answer and requesting a hearing.  Board Proceedings, MLR 22382-22385.

80.    Reynolds through her attorney answered the petition on May 24, 2007.  Board Proceedings, MLR 22414-22417.  The matter was heard before a hearing examiner on July 11, 2007.   Board Proceedings, MLR 22349-22381.

81.    At the hearing, Reynolds testified that her first job after becoming a registered nurse was Pocono Medical Center.  Board Proceedings, MLR 22361.  In her testimony she suggested that she left that employment voluntarily because of the difficult hours:  "I was working nights again and just really started getting to me working nights again, and the children were a little older now but my youngest was nine at the time.  It's just difficult working that shift."  *Id*.

82.    At the hearing, Reynolds also testified that she was taking methadone for menstrual pain management.   Board Proceedings, MLR 22362-63, MLR 22365.  She provides no testimony about her 20 year heroin addiction.  Board Proceedings, MLR 22349-22373.

83.    At the hearing, Reynolds gave this explanation for her testing positive for benzodiazepines was as follows:  "At the time, I was on Ambien for sleep because I had a terrible time sleeping.  I was down at my mom's one night – actually, I was down there for a couple of days.  I didn't have any Ambien with me.  My mother was on Restoril for sleep…. So I took one of her Restoril for sleep.  Two days later, my general nurse manager when she asked me to get the physical and things, so I got the physical and the urine, and the Restoril came up in the urine, which I did not have a prescription for.  That's what kind of started this whole thing."  Board Proceedings, MLR 22362.

84.     Restoril has a half-life ranging from 0.4-0.6 hours and a terminal half-life from 3.5-18.4 hours, so it would be unlikely to show up two days later as Reynolds testified.  Limoges Report at 4.

85.     As recognized by the hearing examiner, the parties stipulated to the violation of the consent agreement as alleged in the petition for relief, and Reynolds presented only mitigating evidence at the hearing.  Board Proceedings, MLR 22350; Reynolds PHMP File, MLR 983.

86.     The hearing examiner found that Reynolds violated the consent agreement.  He found that she did not enroll in FirstLab and, consequently, has not submitted any random unannounced and observed body fluid toxicology screens.  Reynolds PHMP File, MLR 995.  She also failed to submit monthly verification that she was attending support group meetings.  *Id.*   He found that she also failed to comply with her evaluation treatment recommendation that she enter inpatient treatment and be weaned from methadone.  *Id.*

87.     The examiner, however, declined to recommend a full three-year suspension in light of Reynolds' mitigating evidence.  He recommended, instead, suspending her license for no less than three years with the suspension to be stayed when Reynolds provided the Nursing Board with an evaluation from an approved

treatment provider that she is safe to practice nursing.  Reynolds PHMP File, MLR 995-997.

88.     Neither party filed exceptions to the proposed order and the Nursing Board adopted the recommendation as its final order on September 18, 2007. Reynolds PHMP File, MLR 979-980.  No appeal was taken from the order.

89.     Reynolds has never provided PHMP with a consent authorizing PHMP to release information regarding her case to staff of NDTS.  Reynolds PHMP File MLR 881-1067; Harris Deposition 114-116; Knipe Deposition 56-57.

90.     Since the date of the Board decision, Reynolds has never provided the Nursing Board with an evaluation from an approved treatment provider that she is safe to practice nursing.  Board Proceedings; Reynolds PHMP File.

91.     From January 4, 2007 to September 18, 2007, Reynolds was still under the abstention guidelines stipulated in Section 5 (b) (19) of her January 4, 2007 DMU Consent Agreement and Order.  *See* Board Proceedings, MLH 22391-22410; Reynolds PHMP File, MLR 979-980.

92.     At no time during the proceedings before the Nursing Board did Reynolds nor her attorney, Robert Esgro, Esquire, request that as a reasonable accommodation Reynolds be relieved of her obligation under the DMU agreement

to comply with A Better Today's treatment recommendation that she be detoxed from methadone.   *See* Board Proceedings and Reynolds PHMP File.

93.     On June 18, 2008, individuals from the Bureau of Professional and Occupational Affairs informed NDTS director and Dr. William Santoro of NDTS of the change in PHMP's policy which would permit a licensee on a case by case basis to practice while on drug maintenance therapy. Memo regarding telephone conference with Glen J. Cooper and Dr. Santoro, MLR 17404.

### III.    Treatment History 2009-2012.

94.     On June 26, 2009, Reynolds was arrested for Driving Under the Influence of a Controlled Substance among other charges.  On November 16, 2009, Reynolds was admitted to an ARD program and her driver's license was suspended for sixty days.   Monroe County Court of Common Pleas Docket CP-45-CR-0001454-2009, MLR 19184-19191.

95.     On December 5, 2009, Reynolds was arrested for driving with a suspended or revoked license.  On July 20, 2010, Reynolds pled guilty to that charge and was sentenced to sixty days incarceration at the Monroe County Correctional Facility.   Reynolds completed her sentence on September 17, 2010. Monroe County Court of Common Pleas Docket CP-45-SA-0000009-2010, MLR 19192-19195.

96.    On September 18, 2010, Pocono Mountain Regional EMS was dispatched because Reynolds was found unresponsive in her home by a neighbor. The EMS team found her unresponsive, and after treatment she regained consciousness.  She "initially denied use of narcotics but stated that she had taken her prescribed Methadone and Xanax within 20 minutes of each other at an unspecified time earlier in the evening.  She was transferred to the Pocono Medical Center Emergency Department.  Pennsylvania EMS Report, MLR 21432-21437.

97.    On June 20, 2011 Reynolds was involved in a car accident and taken to St. Luke's Hospital.  The assessment of the Emergency Room attending physician was that she suffered from an altered mental status.  St. Luke's Hospital Record, MLR 19962.

98.    An initial drug screen showed that she tested positive for benzodiazepines, methadone and tricyclic antidepressants.  Reynolds reported to the attending physician that she had taken three Xanax tablets that day, although he noted that the patient was currently lethargic and her history was unreliable.  St. Luke's Hospital Record, MLR 19963, 19981.

99.    On August 19, 2011, Reynolds was arrested for, among other charges, Driving Under the Influence of a Controlled Substance and Driving while Operator's Privilege is Suspended or Revoked.  Criminal Complaint MLR 21608-

21613.  Toxicology reports showed the presence of, among other drugs, Diazepam (Valium) and Alprazolam (Xanax) and their metabolites, as well as methadone. Criminal Complaint 21613; Limoges Report at 9.

100.   An NDTS Incident Report dated October 5, 2011, describes an incident in which Reynolds and another client were seen on camera passing pills to one another in the waiting room.  NDTS Records, MLR 18092.

101.   On October 14, 2011, Hightower spoke to Reynolds about the October 5, 2011, incident.  According to a progress note, "Counselor additionally spoke about the most recent incident involving allegations, against client selling medication (pills) in the agency waiting room.  Client denied all accusations and talked about her feelings and concerns of being asked to leave."  NDTS Records, MLR 18051.

102.   In a progress note dated November 22, 2011, Hightower states: "Client continues to produce negative urine specimens but reports she may take an extra pill when situations become too stressful."  NDTS Records, MLR 18742.

103.   As described in an incident report, on November 23, 2011, counselors at NDTS discovered Reynolds in the waiting room slumped in the seat hanging over the side of her chair.  When roused by a counselor, she spoke with very slurred words and her conversation was rambling.  Dr. Wilson wanted her to be

evaluated by an ambulance, but Reynolds refused.  She left with the bus ride she was waiting for.  NDTS record, MLR 187744

104.   Reynolds was seen by Dr. Wilson before she left on her bus ride.  Dr. Wilson noted that Reynolds "[a]ppears to be very lethargic.  Will actually fall asleep in middle of a sentence.  Some of her conversation is rambling and subject matters do not relate to each other."  Dr. Wilson's assessment was that Reynolds was under the influence and she suspected that she had taken Xanax in the waiting room.  Dr. Wilson wrote that she "[d]iscussed with [Reynolds] the drug interactions and the non advisability of mixing benzodiazepines with methadone."  NDTS record, MLR 18738.

105.   On November 28, 2011, Sandra Cooper entered the following in Reynolds' progress notes:  "Presents with garbled speech.  Unable to complete a sentence.  Security found outside getting pills from another client." NDTS record, MLR 18739

106.   In another note entered the same day, Cooper writes:  "A client in waiting room states that she saw Melinda Reynolds taking pills on the bus on the way to the clinic.  Pt states that she took 4 or 5 Klonopin 2 mg tabs which she bought in the parking lot… Keeps talking about different medications when asked about what she took.  Is not making sense."  NDTS Records, MLR 18739.

107.   On December 6, 2011, Hightower wrote a follow-up note to the incident of November 28, 2011:  "During patients last clinic attendance, on Monday 11/28/11 patient was seen by the agency Nurse Practitioner, and the Intake Coordinator as a result of patient appearing off balanced heavily sedated and in danger of her self.  As a result, according to the medical records an incident report was completed by the nurse practitioner and EMS was called as client was assessed and taken to Mullenberg Lehigh Valley Hospital in Bethlehem.  It is unclear if client was discharged or left AMA or if a toxicology was completed."  NDTS record, MLR 18742.

108.   On February 18, 2012, Reynolds was found lying on the side of a road.  She was transported to Pocono Medical Center and was pronounced dead.  Based on the autopsy report, the cause of death was mixed substance toxicity and hypothermia.  Found in her blood was methadone; EDDP, a methadone metabolite; and Alprazolam (Xanax).  According to the report, "Family states deceased had a previous incident, approx.. 3 months ago, where she was found along the road, unresponsive, at which time she was hospitalized at the ICU."  *See* Autopsy Report.

109.   Dr. Richard F. Limoges is a physician certified in Psychiatry and Addiction Psychiatry.  He is a professor in the University of Pennsylvania School

of Medicine in the psychology department and is also on the medical staff there.

He has expertise in addictions and alcoholism and evaluating impaired

professionals.  Limoges Report, Curriculum Vitae.

110.   His opinion to a reasonable degree of medical certainty is that

Reynolds was not qualified to practice practical or professional nursing during the

time period beginning May 8, 2007, or any time thereafter.  Limoges Report 11.


**Respectfully submitted,**


**LINDA L. KELLY**
**Attorney General**


**By:**    *s/ Michael L. Harvey*
**MICHAEL L. HARVEY**
**Senior Deputy Attorney General**

**GREGORY R. NEUHAUSER**
**Chief Deputy Attorney General**
**Chief, Litigation Section**


**Office of Attorney General**
**Litigation Section**
**15th Floor, Strawberry Square**
**Harrisburg, PA  17120**
**Phone:  717-783-6896 - Direct**
**Fax:     717-772-4526**

**Date:  November 13, 2012**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MELINDA LAMBERSON REYNOLDS,<br>                    **Reynolds**<br><br>                    **v.**<br><br>COMMONWEALTH OF PENNSYLVANIA, ET AL.,<br>                    **Defendants** | **CIVIL ACTION<br>NO. 3:09-cv-1492**<br><br>**(Judge Munley)**<br><br>**Electronically Filed** |

## CERTIFICATE OF SERVICE

I, Michael L. Harvey, Senior Deputy Attorney General, Commonwealth of Pennsylvania, hereby certify that on November 13, 2012, I caused to be served a copy of the foregoing document titled Defendants' Statement of Material Facts:

## VIA ELECTRONIC FILING

Lawrence D. Berger, Esquire
Shepherd, Finkelman, Miller & Shah, LLP
35 E. State Street
Media, PA 19063
*(Counsel for Plaintiff)*

Michael Churchill, Esquire
Public Interest Law Center of Philadelphia
1709 Benj. Franklin Pkwy., 2d Floor
Philadelphia, PA 19103
*(Counsel for Plaintiff)*


                    *s/Michael L. Harvey*
                    **MICHAEL L. HARVEY**
                    **Senior Deputy Attorney General**