IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BEVERLY LAMBERSON, AS | : | |
| ADMINISTRATRIX OF THE | : | |
| ESTATE OF MELINDA | : | |
| LAMBERSON REYNOLDS, | : | CIVIL ACTION |
| DECEASED, | : | NO. 09-CV-1492 |
| *Plaintiff* | : | |
| | : | (Judge Munley) |
| *v.* | : | |
| | : | Electronically Filed |
| COMMONWEALTH OF | | |
| PENNSYLVANIA, *et al.,* | : | |
| *Defendants* | | |
| | : | |

**PLAINTIFF'S STATEMENT – IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT – OF MATERIAL FACTS AS TO
WHICH THERE IS A GENUINE ISSUE TO BE TRIED**

Lawrence D. Berger (PA 16028)
SHEPHERD, FINKELMAN, MILLER &
SHAH, LLP
35 East State Street
Media, PA  19063
(610) 891-9880    (phone)
(610) 891-9883    (fax)
LBERGER@sfmslaw.com    (e-mail)

Michael Churchill (PA 04661)
Kaitlyn R. Maxwell (PA 314223)
Public Interest Law Center of
Philadelphia
1709 Benj. Franklin Pkwy., 2d Floor
Philadelphia, PA  19103
(215) 627-7100    (phone)
(215) 627-7183    (fax)
MCHURCHILL@pilcop.org    (e-mail)

Attorneys for Plaintiff

December 18, 2012

Plaintiff Beverly Lamberson, as Administratrix of the Estate of Melinda Lamberson Reynolds, Deceased, respectfully submits this Statement of material facts as to which there is a genuine issue to be tried, in opposition to defendants' motion for summary judgment.  As used herein, "plaintiff" refers to Lamberson, and "Reynolds" refers to plaintiff's decedent Melinda Lamberson Reynolds.

### **Preliminary Statement**

Most of Defendants' Statement of Material Facts (Document No. 86) consists of out-of-context and misleading excerpts from documents which often, themselves, contain multiple levels of inadmissible hearsay from declarants who – while not "unavailable" as that term is used in Rule 804(a) of the Federal Rules of Evidence – have not been deposed in this action.  Many of the alleged facts have no bearing on Reynolds' treatment, or her fitness to practice, or defendants' Methadone Prohibition Policy, but are simply calculated to arouse prejudice against Reynolds.  In short, many of these statements are neither material nor "undisputed."

In the following Statement of Disputed Facts, plaintiff will seek to identify the so-called "Statements of Undisputed Facts" that are disputed, and that are not material.

As stated below, plaintiff also incorporates herein by reference, in further opposition to defendants' motion, plaintiff's Statement of Material Facts in support

of plaintiff's motion for partial summary judgment (Document No 84-2).  Plaintiff also respectfully reserves her right to respond to any additional factual submissions or arguments made by defendants.

## General Objections

A.  Plaintiff objects to the individual statements contained in the Statement of Material Facts to the extent that they are compound.

B.  Plaintiff objects to the individual statements contained in the Statement of Material Facts to the extent that they are based on inadmissible hearsay documents.

C.  Plaintiff objects to the individual statements contained in the Statement of Material Facts on the ground that they are irrelevant to the extent that they do not refer to the time period beginning in May 2007 when Reynolds' license was suspended.

## Individual Statements Contained in Defendants' Statement As To Which There Is A Genuine Issue To Be Tried

1-10.  Paragraphs 1 through 10 consist generally of excerpts from the records of the methadone maintenance treatment that Reynolds received at Morris County After-Care Center from 1997 to 2004, and the records of an employer for whom Reynolds worked from 2001 to 2003.  The excerpts are accurately quoted, but are irrelevant to this action since they preceded the suspension of Reynolds'

license by 3 to 10 years.  In addition, the following specific statements are disputed as incomplete or misleading:

- 9.  The Pocono Medical Center records do not state that she was "discharged . . . on August 14, 2003."  Although defendants' Statement says that Reynolds "failed to show up for work and failed to call off work" on August 15, 2003, the referenced document refers to allegedly substandard performance apparently on August 15, 2003.  *See* Defts. Sum. Judg. Ex. 2[1] (MLR 19862-19863).  Reynolds contested her dismissal as stated in Defts. Sum. Judg. Ex. 2 at MLR 019847.  Other Pocono Medical Center employment records not included by defendants in their Summary Judgment Exhibit show that Reynolds was discharged on August 22, 2003, and that her performance generally was "good" or "fair"; *see* MLR 019890 (Pltfs. App.[2] N).  Reynolds was seeking transfer to the day shift as stated in other Pocono Medical Center records, *see* MLR 019892, 019896 (Pltfs. App. N).  Reynolds' Pocono Medical Center records also include

---

[1] "Defts. Sum. Judg. Ex." refers to the 18 exhibits (forming part of Document No. 87) filed by defendants in connection with their motion for summary judgment, and Statement of Material Facts.  The exhibit number refers to the number assigned by the electronic docketing system (CM/ECF).

[2] "Pltfs. App." includes the Appendix to Plaintiff's Statement of Material Facts In Support of Her Motion for Partial Summary Judgment (Doc. No. 84) (Tabs A through K), and Plaintiff's Appendix in Opposition to Defendants' Motion for Summary Judgment (Tabs L through N) being filed simultaneously with this Statement of Disputed Facts.

positive references from former employers and nursing school including periods

during which she was receiving methadone maintenance treatment and caring for

her three minor children, *see* MLR 019903 through 019907, 019916 (Pltfs.

App. N).

11-34.  Paragraphs 11 through 34 consist generally of excerpts from the

records of the methadone maintenance treatment that Reynolds received at New

Directions Treatment Services.  *See also* paragraphs 39-44, *infra*.  The excerpts are

accurately quoted but are incomplete and misleading**.**  In addition, the following

specific statements are disputed as incomplete or misleading:

- 12.  While it is true that methadone maintenance clinics are not

"licensed" to treat pain, it is also true that methadone maintenance patients may

have medical problems in addition to opioid drug dependency.  Reynolds suffered

from Hepatitis C and suffered from pain from that condition and the treatment for

that condition, for which she was treated by another provider, and her treatment

was approved by New Directions.  *See* Defts. Sum. Judg. Ex. 3 at MLR 18375-

18377, letter from Gastroenterology Associates to Dr. Santoro.

- 13, 15, 17, 18.  It is true that New Directions records show that drug

screens tested positive for opioid drugs on 7/1/2004, 7/10/2008, 9/23/2010,

10/21/2010 and 5/26/2011, but the complete document (Defts. Sum. Judg. Ex. 3,

MLR 017772 through 17781) shows that these were the only five occasions during

4

the time period of more than seven years covered by this document when drug

screen samples tested positive for opiates, which demonstrates that the methadone

maintenance treatment that Reynolds received at New Directions was substantially

successful in enabling her to overcome her opioid drug dependency. (The

additional records cited by defendants merely confirm certain of these test results.)

Both parties' experts on the Methadone Prohibition Policy agree that opioid drug

dependency is a chronic condition. *See* Newman Report (Pltfs. App. A) at 3, and

Ziegler Report (Pltfs. App. B) at 5. Both parties' experts also agree that

methadone is a highly effective treatment for that condition. *See* Newman Report

(Pltfs. App. A) at 4-5, 9, and Ziegler Report (Pltfs. App. B) at 3-4. In Dr.

Newman's words, "Licensed professionals who receive methadone maintenance

treatment are less likely to suffer a relapse in drug use as compared with opioid

dependent persons who are not receiving maintenance treatment." Newman

Report (Pltfs. App. A) at 9. Therefore, while the record cited by defendants does

show that Ms. Reynolds' drug screens tested positive for opiates on the specific

occasions cited by defendants, the same record shows that she was substantially

free of opiate drugs during the time she received methadone maintenance

treatment.

- 14. It is true that New Directions records show that drug screen

samples for collection weeks 8/2/2007, 8/16/2007, and 9/13/2007 tested positive

for cocaine, Defts. Sum. Judg. Ex. 3 (MLR 17776) but the statement fails to note that these were the only three occasions during the seven year period covered by the complete document (Defts. Sum. Judg. Ex. 3, MLR 017772 through 17781) when drug screen samples tested positive for cocaine.  The statement also fails to note that during the period of time immediately preceding the time when these three readings occurred, Reynolds was under extraordinary stress because among other things:  (a) her license had been suspended as a result of defendants' wrongful demand that she discontinue methadone maintenance treatment; (b) her husband died; and (c) Reynolds was the sole support for her three children and infant grandchild.  Hearing Transcript (7/11/2007) at 37-39, Pltf. Ex. P-7, Plfts. App. F, and Defts. Sum. Judg. Ex. 9.  These circumstances do not excuse Reynolds' isolated use of cocaine, but there is no evidence that defendants would otherwise impose such a harsh penalty under these circumstances.  Rather, defendants suspended Reynolds' license because of their undisclosed Methadone Prohibition Policy as set forth in plaintiff's motion for partial summary judgment.

- 21-34.  To the extent that these records refer to problems that Reynolds experienced with benzodiazepine treatment prior to the time that her license was suspended in 2007, they are incomplete or irrelevant, and must at least be qualified in their entirety by reference to the Declaration of William Santoro, M.D. (hereinafter "Santoro Declaration"), Pltfs. App. L, especially ¶¶11-18.

- 22.  The cited language is incomplete and misleading.  The cited note (Defts. Sum. Judg. Ex. 3, MLR 18586) also states:  "Assessment was discussed and explained. that client can not solicit mental health services because she can not afford them. because she can not work enough hours because she can not earn work take outs.  It was recommended that I re-explain the policies and procedures regarding continued use.  That I assist client with available list of treating psychiatrist in her area that accepts her insurance, encourage continued treatment and compliance."

- 23.  The cited language is incomplete and misleading.  Hightower also noted on August 2, 2004 at MLR 18573: "On the contrary client continues to enhance her employability and is taking 3 week course in order to be employable at a new agency she has applied with."  Additionally, the "assessment" for the same session stated: "Client appeared to be frustrated and concerned about her mental health, addiction and her finances. She seems to feel like she is trapped with no way out but to detox."

- 24.  The cited language is incomplete and misleading.  Defendants omitted the concluding phrase "while trying to connect with mental health services" from the final sentence quoted from MLR 18532.

- 29.  The cited language is incomplete and misleading.  The first cited note (Defts. Sum. Judg. Ex. 3, MLR 17938) also states:  "pt attempting to get

psych intake, but insurance limited for MH; Advised [that] abruptly stopping benzo's is not advisable or safe."

- 30.  The cited language from MLR 18526 is incomplete and misleading.  The sentence preceding the comment cited by defendants indicates: "Mrs. Reynolds continues to remain opiate free."  The sentence following the comment cited by defendants states:  "Likewise she continues to successfully maintain her current employment status.  Presently, client would like be seen by psychiatrist to be treated for symptoms of anxiety."

35-38.  Paragraphs 35 through 38 consist generally of excerpts from the records of the treatment that Reynolds received at Cedar Point Family Services in 2005.  The excerpts are accurately quoted but are incomplete and misleading.  In addition, the following specific statements are disputed as incomplete or misleading:

- 37.  The note partially quoted by defendants (Defts. Sum. Judg. Ex. 5, MLR 21100) refers to problems that Reynolds experienced because she "[had] been using Zanax [sic] from a doctor outside [New Directions] without first getting permission."  Permission was subsequently granted by Dr. Santoro for Reynolds to receive Xanax.  *See* Santoro Declaration, ¶16, and Exhibit C to Santoro Declaration.  Defendants also omitted the following sentence from the complete note:  "She explained her side of the story & discussed difficulties this is causing."

Those difficulties included the loss of "take outs" as referenced in the portion cited by defendants.  The norm for methadone maintenance treatment is that the patient receives her methadone dose at the clinic, but may also earn some "take out" privileges for some of her doses, if compliant with clinic rules.  *See* Newman Report (Pltfs. App. A) at 13.  The New Directions clinic that Reynolds attended at 2442 Brodhead Road, Bethlehem, PA, was about 40 miles distant from her home at 409C Deer Run Road, Pocono Summit, PA, and therefore daily attendance at the clinic, while Reynolds was also working, was difficult for her.  Cedar Point Family Services is at the same location, 2442 Brodhead Road.  Reynolds was referring to the hardship that resulted from her need to manage these appointments, together with her job, without "take out" privileges because of her taking Xanax which was not yet approved.  *See also* paragraphs 22 and 29, *supra*.

- 38.  The cited note (Defts. Sum. Judg. Ex. 5, MLR 21051) must be read together with the additional notes cited above at paragraphs 22, 29 and 37.  In addition, the cited note (MLR 21051) states that "Client was compliant with treatment and recommendations."

39-44.  Paragraphs 39 through 44 consist generally of excerpts from the records of the methadone maintenance treatment that Reynolds received at New Directions Treatment Services.  *See also* paragraphs 11-34, *supra*.  The excerpts are accurately quoted but are incomplete and misleading.  To the extent that these

records refer to problems that Reynolds experienced with benzodiazepine treatment prior to the time that her license was suspended in 2007, they are incomplete or irrelevant, and must at least be qualified in their entirety by reference to the Santoro Declaration, Pltfs. App. L, especially ¶¶11-18.

- 40. *See also* the full text of the 8/24/2004 note at MLR 18564 (partially cited in paragraph 40) which includes the following not quoted by defendants: "Client reports her liver doctors is prescribing the xanax and she has to take them."

- 42. *See also* the full text of the 9/8/2005 letter at MLR 18375 to 18376 (partially cited in paragraph 42) which includes the following not quoted by defendants: "The Xanax was originally prescribed for bouts of anxiety, but also for sleeplessness, and apparently has been working extremely well in helping her deal with these inevitable side effects of this hepatitis C treatment. I have discussed with Monique [Hightower] some of these concerns, and we both expressed that we feel that she has been extremely compliant and does not seem to be abusing Xanax at this time. I have been extremely happy with Malinda [sic] as a patient, following directions and reporting things that have been bothering her. This [treatment for hepatitis C] is an extremely delicate treatment to put someone through, and she has not missed one blood draw or one appointment, of which there are quite a few. She has followed our suggestions and has been very

proactive in her own treatment.  From what I understand, she has been able to work through this treatment, which is quite commendable for anyone on interferon and ribavirin.  Also, I have noted that according to my prescription history, she has not been abusing Xanax, and rather does not seem to be taking it on much of a regular basis either; there have been times when I have asked her if she needs refills, and she says that she is doing okay for that time period."

45-61.  Paragraphs 45 through 61 consist generally of excerpts from files relating to Reynolds maintained by defendant Division of Professional Health Monitoring Programs ("PHMP").  The excerpts are accurately quoted but are incomplete and misleading, and this response is qualified by reference to the full text and context of the PHMP records.  In addition, the following specific statements are disputed as incomplete or misleading:

- 45-46.  If material, which plaintiff denies, the Voluntary Recovery Program and Disciplinary Monitoring Unit are not separate.  They are staffed by the same persons, including Harris.  *See* Harris Deposition (8/22/2011) at 13-14 (Pltfs. App. C).

- 51-52, 59.  Reynolds did respond to Harris' letters and attempt to "enroll" in the VRP as stated in paragraphs 53 and 55.

- 54, 58.  Reynolds discontinued attendance at A Better Today because, as stated in the Santoro Declaration, ¶¶19-21 and Santoro's letter to Harris,

Exhibit D to Santoro Declaration, and also in the report of defendants' methadone policy expert Dr. Ziegler, Pltfs. App. B at 9, Reynolds learned that A Better Today was opposed to methadone maintenance treatment. *See also* Pltf. Ex. P-7 (Hearing Transcript) at 72, Pltfs. App. F at p. 28 (Reynolds' testimony that A Better Today counselor told her that "you would have to come off the methadone to come here anyway").

62-64.  Paragraphs 62 through 64 consist generally of references to the report of Dr. George Woody and are therefore qualified by reference to the full text of his report, including Dr. Woody's finding that:

> In view of her positive response to methadone maintenance over a period of at least 1.5 years; the absence of current unprescribed drug use by history and a review of the medical records, the psychiatric examination and urine test results that were positive only for drugs that are currently prescribed (*methadone*, *benzodiazepine*); and the report from a recent employer that her work has been good during a period of time that she has been on methadone, I think *she is able to practice nursing with the requisite skill and safety* <u>provided she is monitored for a time to be determined by the Board</u>.

Woody Report at 5 (Pltf. Ex. P-1, Pltfs. App. F) (italics and boldface added, underlining in original).  In addition, the following specific statements are disputed as incomplete or misleading:

- 63-64.  Contrary to defendants' assertion that Dr. Woody's report does not mention Reynolds' "history of benzodiazepine use," the report contains numerous references to Reynolds' use of benzodiazepines, including the original

use of Restoril that led to her being referred to PHMP, her treatment with

benzodiazepines for anxiety and insomnia, and the fact that her "urine test results

. . . were positive only for drugs that are currently prescribed (methadone,

benzodiazepine)."  Pltf. Ex. P-1 at pp. 2, 3, 5, Pltfs. App. F at pp. 3, 4, 6.

  65-80.  Paragraphs 65 through 80 consist generally of references to the

PHMP record for the time period from Dr. Woody's report through but not

including the July 11, 2007 hearing before the Board of Nursing Hearing

Examiner, Mr. Henderson.  They are incomplete and misleading because, as the

PHMP Case Manager, Ms. Harris, admitted at her deposition in this matter, the

PHMP record did not include Dr. Woody's report.  *See* Harris Deposition

(8/22/2011) at pp. 38-42 (Pltfs. App. C).  They are also incomplete and misleading

because they make no reference to the Methadone Prohibition Policy, which

defendants were continuing to conceal.  The references are otherwise generally

accurate but the following specific statements are disputed as incomplete or

misleading:

  •  65-80.  These paragraphs are misleading in their entirety because they

fail to disclose that all of the actions taken by PHMP were taken pursuant to the

Methadone Prohibition Policy which had never been disclosed to Reynolds.  *See*

Plaintiff's Statement of Material Facts In Support Of Her Motion for Partial

13

Summary Judgment (Document No. 84-2) which is incorporated herein by reference.  Also:

- 65.  Defendants did not disclose the Methadone Prohibition Policy in the Order to Show Cause.

- 66-68.  Defendants did not disclose the Methadone Prohibition Policy in the Consent Agreement and Order.

- 72.  When Ms. Harris again referred Reynolds to A Better Today, she did not disclose the Methadone Prohibition Policy.

- 73-74.  Carolan wrote the letter (Defts. Sum. Judg. Ex. 8, MLR 967) dated July 11, 2007 after testimony was closed and six months after the date of the evaluation, and the evaluation in January 2007 was not conducted by Carolan but by another employee who had retired.  *See* Hearing Transcript (7/11/2007) at 12, 17, Pltf. Ex. P-7 (Pltfs. App. F) and Defts. Sum. Judg. Ex. 9 at pp. 15 and 17. Carolan did not disclose in the letter that A Better Today was opposed to methadone maintenance treatment, or that the recommendation for rapid methadone detoxification was medically unwise.  *See* Santoro Declaration, ¶¶19-20, and Ziegler Report (Pltfs. App. B) at 9.

- 75-76.  Ms. Harris did not disclose the Methadone Prohibition Policy in her letters to Reynolds.

- 77-79.  Defendants did not disclose the Methadone Prohibition Policy in the Petition for Appropriate Relief or in the Preliminary Order issued by the Probable Cause Screening Committee.

- 80.  In Reynolds' Answer to the Petition for Appropriate Relief, Reynolds stated that the A Better Today recommendation for rapid detoxification from methadone was medically inadvisable (Answer at Defts. Sum. Judg. Ex. 9, p. 79, MLR 22415) and further stated:

> She had be[en] successfully participating a treatment program
> . . . prior to the Agreement; 4) the Americans with Disabilities
> Act, 28 CFR PART 35, §35.131 (a)(2)(ii) protected the
> Respondent's right to work from the onset of the Agreement.
> The Americans with Disabilities Act section referenced above
> states ". . . an individual who is currently participating in a
> supervised rehabilitation program and is not engaging in current
> illegal use of drugs is protected."

*Id.* at Defts. Sum. Judg. Ex. 9, p. 80 (MLR 22416).

81-84.  Paragraphs 81 through 84 consist generally of references to the transcript of the July 11, 2007 hearing before Board of Nursing Hearing Examiner Henderson, and are therefore qualified in their entirety by reference to the full transcript which appears both at Pltfs. App. F (Pltf. Ex. P-7), pp. 11-35, and Defts. Sum. Judg. Ex. 9, pp. 13-37.  In addition, the following specific statements are disputed as incomplete or misleading:

- 81.  Reynolds did not state or suggest that she left her position at Pocono Medical Center voluntarily, and *see* paragraph 9, *supra*.  Her testimony

that the night shift was difficult for her was truthful.  Throughout her employment

at Pocono Medical Center, she was seeking a transfer to the day shift.  *See, e.g.,*

Pocono Medical Center records, Pltfs. App. N (MLR 019892, 019896).  Reynolds'

Pocono Medical Center records also include positive references from former

employers and nursing school including periods during which she was receiving

methadone maintenance treatment and caring for her three minor children, *see*

MLR 019903 through 019907, 019916 (Pltfs. App. N).

- 82.  While Ms. Reynolds is no longer available to explain her

testimony, she did also testify at the same page cited by defendants that she was

prescribed Percocet for pain.  Percocet is a combination drug that includes

oxycodone, an opioid drug, and therefore is potentially addictive.  Methadone is

used for treatment of pain as well as opioid dependence.  Plaintiff does not dispute

that Ms. Reynolds was on methadone maintenance treatment for opioid

dependence, but she may have believed that it also relieved her pain.

- 83.  Reynolds' testimony about benzodiazepine usage must be

qualified by reference to the Santoro Declaration, Pltfs. App. L, especially ¶¶11-

18.

- 84.  As Dr. Woody recorded in his report, "When asked to explain the

benzodiazepine she stated that she had traveled to upstate New York on the

Monday before the urine was taken (2/9/05 was a Wednesday), and took one of her

16

mother's Restoril tablets when she arrived on Monday night because she had trouble sleeping. She had received prescriptions for both Restoril and Ambien [a benzodiazepine] at various times (see attached records) and had Restoril at home, but she forgot to take it with her on the trip so took one of her mother's tablets. She returned home on Tuesday and reported for work on Wednesday, which was the 'bad day'." Pltf. Ex. P-1 (Pltfs. App. F) and Defts. Sum. Judg. Ex. 10 (Woody Report) at 2. Reynolds was truthful in stating that she took Restoril from her mother's prescription two days before, but may have also taken her prescribed Xanax or Ambien (both benzodiazepines) when she returned home. The PHMP intake form (Defts. Sum. Judg. Ex. 8 at p. 149), refers to "benzodiazepines," not specifically Restoril.

85-88. Paragraphs 85 through 88 consist generally of references to the decision of the Hearing Examiner and the Board of Nursing Order, and are therefore qualified in their entirety by reference to the full text which appears at Pltfs. App. H. In addition, the following specific statements are disputed as incomplete or misleading:

- 85-86. Defendants did not disclose the Methadone Prohibition Policy to Hearing Examiner Henderson. In fact, defendants actively concealed the Methadone Prohibition Policy from Ms. Reynolds, her attorney, and Hearing Examiner Henderson by presenting misleading testimony from Ms. Harris that the

17

"Board of Nursing" did not have such a policy, and that PHMP was monitoring nurses "who are on methadone maintenance and who are permitted to work."  Pltf. Ex. P-7 (Hearing Transcript 7/11/2007) at 75-76.  (Appendix Tab F).  *See also* Pltfs. Statement of Undisputed Facts (Document No. 84-2) at ¶¶24-27.

• 88.  Defendants did not disclose the Methadone Prohibition Policy to Reynolds or her attorney.

89.  There is no evidence that defendants ever told Reynolds that they required a consent authorizing PHMP to release information concerning her case to New Directions.  However, the New Directions records include a Release of Confidential Information signed by Reynolds and dated 12/27/2007, authorizing PHMP to disclose information to New Directions.  Pltfs. App. N (MLR 18314).

90.  Defendants never informed Reynolds that she could obtain an evaluation from any provider but A Better Today.  Indeed, defendants admit that after the Board decision, Ms. Harris of PHMP directed Reynolds to return to A Better Today.  *See* paragraph 72 of Defendants' Statement.  Reynolds and New Directions contacted A Better Today.  Dr. Santoro also sent a letter to Ms. Harris of PHMP dated February 15, 2008, a copy of which is date-stamped as received by PHMP on February 21, 2008, and which Ms. Harris acknowledged at her deposition that she had received but never replied to.  *See* Pltf. Ex. P-18 (Pltfs. App. F at pp. 39-40) and Harris Deposition at pp. 113-114 (Pltfs. App. C).  *See*

*also* Santoro Declaration, ¶¶19-21 and Exhibit D.  In the letter, which described

Dr. Santoro's contact with A Better Today, Dr. Santoro stated that "I am asking

you to allow Melissa [sic] Reynolds to be evaluated by an alternative counseling

center as a representative from 'A Better Today' has clearly stated that he has a

bias against the legitimate treatment she is receiving," and concluded "I would be

pleased to discuss any aspect of this letter with you."  In addition, the New

Directions Executive Director, Mr. Cooper, met with and submitted extensive

information concerning methadone maintenance treatment to defendants on

Reynolds' behalf (Pltfs. App. J), at the conclusion of which defendants informed

Mr. Cooper and Dr. Santoro that they were revising the Methadone Prohibition

Policy.  Nevertheless, defendants refused to disclose the revised policy to Reynolds

or to New Directions, and as recently as August 2010 when they filed their Answer

to the Amended Complaint, continued to deny that any such policy existed.

Answer (Document No. 43) at ¶63.

92.  Reynolds specifically requested in her testimony that she be permitted to

continue to receive methadone maintenance treatment.  *See* Pltf. Ex. P-7 (Pltfs.

App. F, and Defts. Sum. Judg. Ex. 9) at 63, 70-72.  *See also* paragraph 91, *supra*.

93.  Referring to the revised methadone policy, the existence of which

defendants subsequently continued to deny, the author of the memorandum

referred to by defendants (Ms. Sheaffer who was defendants' "Prosecutor" in their

proceeding against Reynolds), also stated:

> Mr. Cooper has asked to be given a copy the policy once it is
> written. Peter Marks [one of defendants' attorneys] told him we
> would take the request under advisement.

Defts. Sum. Judg. Ex. 11.  Notwithstanding Mr. Cooper's request for a copy of the

policy, as disclosed in defendants' Memorandum, defendants never disclosed the

policy, and continued to deny that it existed.  Answer (Document No. 43) at ¶63.

96.  Plaintiff has no information concerning the report by Pocono Mountain

Regional EMS cited by defendants, but the report should be read in light of the

following facts:  On July 20, 2010 as stated in defendants' paragraph 95,

Ms. Reynolds was sentenced to sixty days incarceration in the Monroe County

Prison for driving with a revoked or suspended license.  During this incarceration,

Ms. Reynolds was not permitted to receive methadone, and therefore experienced

the adverse effects that defendants' expert, Dr. Ziegler, stated would occur as a

result of rapid methadone detoxification.  *See* Pltfs. App. N, MLR 018034, and *see*

Ziegler Report (Pltfs. App. B) at 9.  Ms. Reynolds was discharged from the

Monroe County Prison shortly before September 18, 2010 (Pltfs. App. N,

MLR 018536) at which time Ms. Reynolds would have been a methadone "naïve"

patient with no tolerance to the effects of methadone, as explained in the Newman

Report (Pltfs. App. A at 6-7).  Ms. Reynolds did not return to treatment at New

Directions until September 23, 2010 (Pltfs. App. N, MLR 017896 to 017989), at
which time she was restarted on a minimal starting dose.  *See* Dosage History,
Pltfs. App. N at MLR 017810.  Therefore, if Ms. Reynolds did take methadone on
September 18 following her forced methadone detoxification, she may have taken
a larger "take home" dose from her former treatment at New Directions, not
appreciating that this dose was too large for her in light of her methadone-naïve
state.

100.  The records of New Directions, as cited in defendants' paragraph 101,
also show that Ms. Reynolds denied that she was "passing pills."

101-107.  Paragraphs 101 through 107, which relate to the time period from
October 14, 2011 to December 6, 2011, are misleading and incomplete in that they
fail to disclose that during this time period, Reynolds was advised by New
Directions to enter in-patient treatment for benzodiazepine detoxification because
of the problems that she was experiencing at this time with her use of
benzodiazepines.  *See* page MLR 18742, incompletely quoted by defendants which
also states (note dated 11/23/2011) that "Client continues with treatment and is
struggling across all domains. Client continues to produce negative urine
specimens but reports she may take an extra pill when situations become too
stressful," and (note dated 12/6/2011) that "patient will be mandated to comply
with long term inpatient rehabilitation referral. To receive a comprehensive

services which are comprised of, psychological work up, possible detox off of benzo's, stabilization of drug & alcohol treatment and a medical attention if needed." Reynolds accepted this recommendation, and was treated at the Reading Hospital and Medical Center Detoxification and Rehabilitation Unit ("Reading Hospital Detox. Unit") from December 13, 2011 to January 9, 2012, and was successfully weaned from benzodiazepines. *See* Santoro Declaration, ¶¶22-24. *See also* paragraph 100, *supra*.

108.  Paragraph 108 relates to Ms. Reynolds' death on February 18, 2012, and to findings in the autopsy report based on blood which was drawn 49 hours after she was pronounced dead. Paragraph 108 is incomplete and misleading in that it fails to disclose that Ms. Reynolds failed to receive her methadone dose on February 16, 2012 because her scheduled transportation did not pick her up that day. Pltfs. App. N, MLR 021019. Plaintiff does not have any further information about the immediate circumstances which resulted in her daughter's death, but this tragic event has no bearing on defendants' violation of Reynolds' right at an earlier time to be free from discrimination on account of her disability.

110.  *See* Santoro Declaration (Pltfs. App. L).

### Incorporation by Reference of Plaintiff's Statement of Material Facts (Document No. 84-2)

The facts set forth in Plaintiff's Statement of Material Facts In Support Of Her Motion for Partial Summary Judgment (Document No. 84-2) are also relevant

to, and should be considered in connection with, defendants' Motion for Summary

Judgment and defendants' supporting Statement of Material Facts.  Therefore,

plaintiff incorporates those additional facts herein by reference, as additional facts

to be considered in opposition to defendants' motion.

Respectfully submitted,

/s/ Lawrence D. Berger
Lawrence D. Berger (PA 16028)
Shepherd, Finkelman, Miller & Shah, LLP
35 East State Street
Media, PA  19063
(610) 891-9880    (phone)
(610) 891-9883    (fax)
LBERGER@sfmslaw.com    (e-mail)

/s/ Michael Churchill
Michael Churchill (PA 04661)
Kaitlyn R. Maxwell (PA 314223)
Public Interest Law Center of Philadelphia
1709 Benjamin Franklin Parkway, 2d Floor
Philadelphia, PA  19103
(215) 627-7100    (phone)
(215) 627-7183    (fax)
MChurchill@pilcop.org    (e-mail)

Attorneys for Plaintiff

Dated:  December 18, 2012