# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BEVERLY LAMBERSON, as** | : | **No. 3:09cv1492** |
| **Administratrix, of the Estate of** | : | |
| **Melinda Lamberson Reynolds,** | : | **(Judge Munley)** |
| **Deceased,** | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **COMMONWEALTH OF** | : | |
| **PENNSYLVANIA,** | : | |
| **PENNSYLVANIA DEPARTMENT OF** | : | |
| **STATE, PENNSYLVANIA BUREAU** | : | |
| **OF PROFESSIONAL &** | : | |
| **OCCUPATIONAL AFFAIRS,** | : | |
| **PENNSYLVANIA DIVISION OF** | : | |
| **PROFESSIONAL HEALTH** | : | |
| **MONITORING PROGRAMS,** | : | |
| **PENNSYLVANIA STATE BOARD OF** | : | |
| **NURSING, BASIL L. MERENDA,** | : | |
| **LINDA TANZINI AMBROSO,** | : | |
| **K. STEPHEN ANDERSON,** | : | |
| **CHRISTOPHER BARTLETT,** | : | |
| **RAFAELA COLON, KATHLEEN M.** | : | |
| **DWYER, JUDY A. HALE, SUZANNE** | : | |
| **M. HENDRICKS, JOSEPH J.** | : | |
| **NAPOLITANO, ANN L. O'SULLIVAN,** | : | |
| **JANET H. SHIELDS and JOANNE L.** | : | |
| **SORENSEN,** | : | |
| **Defendants** | : | |

## MEMORANDUM

Before the court are cross-motions for summary judgment. Plaintiff filed the first motion, which seeks partial summary judgment with respect to the invalidity of the Methadone Prohibition Policy at issue in this case. (Doc. 84). Defendants filed the second motion, which contends that no

genuine issues of material fact exist and that they are entitled to judgment as a matter of law. (Doc. 85). These motions are fully briefed and ripe for disposition.

**Background**

This case arises out of Melinda Lamberson Reynolds' attempts to challenge the suspension of her license as a registered nurse in the Commonwealth of Pennsylvania. Reynolds was a licensed practical nurse ("LPN") and a registered nurse ("RN") in the Commonwealth for over fifteen years. (Doc. 9, Am. Compl. ¶ 18; Doc. 43, Answer ¶ 18). Reynolds suffered from substance abuse problems, and in 2007, the Pennsylvania Boar of Nursing suspended her license to practice nursing. (Doc. 9, Am. Compl. ¶¶ 17, 64; Doc. 43, Answer ¶¶ 17,64). After her license was taken away, Reynolds initiated the instant action against Defendants Commonwealth of Pennsylvania, Pennsylvania Department of State, Pennsylvania Bureau of Professional and Occupational Affairs, Pennsylvania Division of Professional Health Monitoring Programs, Pennsylvania State Board of Nursing, Basil L. Merenda, Linda Tanzini Ambroso, K. Steven Anderson, Christopher Bartlett, Rafaela Colon, Kathleen M. Dwyer, Judy A. Hale, Suzanne M. Hendricks, Joseph J. Napolitano, Ann L. O'Sullivan, Janet H. Shields and Joanne L. Sorensen

(collectively "defendants").[1]  (Doc. 9, Am. Compl.).  Plaintiff contends that she is a qualified individual with a disability because of her drug addiction and she asserts that defendants revoked her nursing license pursuant to a policy that violates both the Americans with Disabilities Act, 42 U.S.C. § 12132, *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 701, *et seq.*  The undisputed material facts as presented by both parties are as follows.[2]

### A. Opioid Addiction and History of Treatment

Reynolds was addicted to "opioid" drugs and used heroin off and on since the late 1970s.[3]  (PSOF ¶ 1; DSOF ¶ 2).  Addiction to

---

[1] Melinda Lamberson Reynolds initiated this action but passes away during its pendency.  (Doc. 72, Unopposed Mot. for Substitution of Parties). Beverly Lamberson, as the Administratrix of Melinda Lamberson Reynolds' estate, succeeded Reynolds as the plaintiff in this matter.  (Doc. 73, Order dated June 7, 2012).  To avoid confusion, the court will refer to Melinda Lamberson Reynolds as "Reynolds" and Beverly Lamberson as "plaintiff."

[2] When examining the undisputed material facts, the court primarily relied upon plaintiff and defendants' statements of material facts.  (See Doc. 84-2, Pl.'s Statement of Material Facts (hereinafter "PSOF"); Doc. 86, Defs.' Statement of Material Facts (hereinafter "DSOF")).  The court also examined plaintiff and defendants' statement of material facts in opposition to the opposing parties' statement of facts, plaintiffs' amended complaint, defendants' answer, as well as other appropriate documents in the record. (See Doc. 9, Am. Compl.; Doc. 43, Answer; Doc. 95, Pl.'s Statement–in Opp'n to Defs.' Mot. for Summ. J.–of Material Facts (hereinafter "PSOF in Opp'n"); Doc. 97, Defs.' Statement of Material Facts in Opp'n to Pl.'s Mot. for Partial Summ. J. (hereinafter "DSOF in Opp'n")).

[3] Opioid drugs are defined, for the purposes of this opinion, as psychoactive substance that works by binding to the body's opioid receptors.  (PSOF ¶ 1).  Opioids include "opiates," drugs directly derived from the opium poppy, and other drugs that stimulate the opioid receptors.

3

opioids–whether illicit drugs such as heroin or prescription opioids for use as analgesics–has been recognized for almost a century to be a chronic medical condition and not a "bad habit" that can be eliminated given sufficient motivation.  (PSOF ¶ 2).  Chronic addiction to opioids is a physical or mental impairment that substantially limits one or more life activities.  (Id. ¶ 3).

### 1. Morris County Aftercare Center (1997-2004)

Reynolds received methadone maintenance treatment for her opioid addiction at Morris County Aftercare Center ("MCAC"), in Randolph, New Jersey, from approximately October 1997 to February 2004.  (Id. ¶ 8; DSOF ¶ 1).  Methadone is useful in treatment of opioid drug dependence both as a short-term medication to control withdrawal symptoms ("detoxification") and as a long-term ("maintenance") medication to assist opioid dependent patients to refrain from use of illicit drugs.  (PSOF ¶ 4). Methadone maintenance treatment is extremely effective.  (Id. ¶ 6).  A person with chronic opioid drug dependency must often continue to receive methadone maintenance treatment on a long term basis.  (Id. ¶ 7).  Clinics that provide methadone maintenance treatment are subject to exacting regulatory standards.  (Id. ¶ 5; DSOF ¶ 12).

The physician and nurse progress notes from Reynolds' first visit to

_____

(Id.)

4

MCAC on October 2, 1997 reflect that she used Xanax in addition to heroin.[4] (DSOF ¶¶ 2-3). In a June 4, 2003 doctor's note, a MCAC physician recorded, "Benzos given by psychiatrist." (Id. ¶ 5). This note also stated that Reynolds was "[a]dvised to try to get off Benzos." (Id.) On August 18, 2003, MCAC health providers strongly urged Reynolds to enter an inpatient detox program for benzodiazepines. (Id.) A note dated October 6, 2003 states that Reynolds was discharged on September 27, 2003 after successfully completing an eleven day benzodiazepine detox program at Saint Claire Hospital. (Id. ¶¶ 6-7).

*2. New Directions Treatment Services (2004)*

On March 29, 2004, Reynolds enrolled in New Directions Treatment Services ("NDTS"), in Bethlehem, Pennsylvania, where she received methadone maintenance treatment from March 2004 to July 2010 and September 2010 to February 2012. (DSOF ¶ 11; PSOF ¶ 8). Monique Hightower was assigned as Reynolds' counselor at NDTS. (DSOF ¶¶ 19-23).

On April 12, 2004, Hightower assessed Reynolds and noted that she was vague with her answers, and information. (Id. ¶ 20). Hightower recorded that Reynolds "seems to be vague when disclosing information

___

[4] Xanax is a trade name for the drug Alprazolam, which is part of the class of drugs known as benzodiazepines. (PSOF at 17 n.6).

regarding her family history and past experiences with drugs.  She also seems to minimize her use and makes light of it.  Client is guarded and is feeling out her therapy session."  (Id.)  Hightower completed a psychological evaluation of Reynolds on April 29, 2004 and identified "Benzo addiction" as one of her underlying problems.  (Id. ¶ 21).

From the time she began treatment with NDTS to the end of 2004, NDTS staff members cautioned Reynolds against using benzodiazepines for her anxiety and attempted to help her detox from them.   In an October 2004 summary of Reynolds' progress, Hightower noted that "benzo use is now being monitored by our program doctor for a successful detox, who is simultaneously treating her anxiety."  (Id. ¶ 25).  In the final summary note of 2004, dated December 29, 2004, Hightower stated that Reynolds successfully detoxed from benzodiazepines.  (Id. ¶ 26).

From April 1, 2004 through the end of December 2004, Reynolds submitted to thirty-three drug tests.  (Doc. 87-3, NDTS Med. R. at 17772-17773).  Reynolds tested positive for opiates once on July 1, 2004.  (Id. at 17772; DSOF ¶ 13).  Reynolds tested positive for benzodiazepines from the time she began treating with NDTS until September 2004, after which time she tested negative for benzodiazepines until the final drug test of the year on December 30, 2004.  (Doc. 87-3, NDTS Med. R. at 17772).

*3. New Directions Treatment Services (2005)*

6

Despite NDTS staff members' attempts to detox Reynolds from benzodiazepines, she resumed using them in early 2005. (DSOF ¶¶ 27-30). On March 1, 2005, NDTS sent Reynolds a notice stating, "[i]t is our determination that you are not ready, willing or able to respond to this level of care. Therefore, beginning on the date of Fri 3/4/05 you will be placed on and begin a mandatory detox from this program. The detox will last for 21 days followed by a discharge for non-compliance with treatment expectations." (Id. ¶ 31). Reynolds appealed the decision to place her on mandatory detox, and on March 3, 2005, a multi-disciplinary team reversed the decision and directed Reynolds to Cedar Point Family Services, a division of NDTS, for treatment of her anxiety disorder. (Id. ¶¶ 32-34).

On March 15, 2005, Reynolds began treatment at Cedar Point Family Services. (Id. ¶ 35). The initial evaluation form completed on Reynolds' first day of treatment at Cedar Point Family Services recorded her symptoms as follows: "Symptoms of anxiety, panic attacks, hyperactivity, insomnia. Impairments include being less aware in the daytimes, more groggy. Tired in the afternoon. Has trouble concentering when anxious. Feels ill and shaky when having panic attacks." (Id.) This same initial evaluation form also states that Reynolds' use of benzodiazepines to manage anxiety led to her need for mental health services. (Id. ¶ 36). Cedar Point Family Services and/or NDTS care providers eventually

7

approved Klonapin–a benzodiazepine–for Reynolds.  (Id. ¶ 39).

In a file note dated August 17, 2005, Hightower recorded, "I explained to client her urine [sample drug tests] have been coming back positive for Xanax and she has been approved for Klonapin only. . . . When asked about Xanax use client had very little to say."  (Id.)  In her next file note, recorded on August 24, 2005, Hightower wrote, "We continued discussion regarding unauthorized benzo use.  Client reports her liver doctor[] is prescribing the xanax and she has to take them. . . . Client is concerned about losing [her] takes outs. . . . she is exhibiting addictive behaviors by not informing her treating psychiatrist about additional xanax. . . ."[5]  (Id. ¶ 40; Doc. 87-3, NDTS Med. R. at 18564).  In her August 31, 2005 progress summary, Hightower wrote that "Mrs. Reynolds continues to remain opiate free.  However, client continues to struggle with recurring benzo use."  (DSOF ¶ 41).

On September 8, 2005, Candice S. Cerracchio of Gastroenterology Associates, Ltd.  wrote a letter to Dr. William Santoro of NDTS to explain their prescription of Xanax to Reynolds.  (Id. ¶ 42; Doc. 87-3, NDTS Med. R. at 18375-18376).  Cerracchio explained that they were unaware that Reynolds was taking methadone when Xanax was first prescribed to her

---

[5] "Take outs" are doses of methadone a patient can take away from the clinic.  (PSOF in Opp'n ¶ 37).

and that Xanax may not be best given Reynolds' history. (Doc. 87-3, NDTS Med. R. at 18375). Notwithstanding Cerracchio's letter, NDTS revoked Reynolds' "take out" privileges because she had been taking Xanax prescribed by a doctor outside of the clinic without first obtaining NDTS's permission. (DSOF ¶ 37). Losing "take outs" was a hardship for Reynolds, and she was increasingly depressed and anxious because she had to drive to NDTS every day to receive methadone. (Doc. 87-5, Cedar Point Med. R. at 21100-21101). NDTS physicians eventually approved Reynolds' use of Xanax to manage her anxiety; however, as of October 2005, NDTS care providers remained concerned that Reynolds would self-medicate with family members' medications when she suffered headaches. (DSOF ¶¶ 43-44).

Although Reynolds continued to receive methadone maintenance treatment at NDTS, she was discharged from Cedar Point Family Services on November 22, 2005. (Id. ¶ 38). Reynolds' discharge summary form states that she was discharged because of "non-compliance with appts, no response to letter inquiring about interest in services," and it appears that she had not been at Cedar Point for treatment since September 8, 2005. (Doc. 87-5, Cedar Point Med. R. at 21051-21052).

Throughout 2005, Reynolds submitted to thirty-six drug tests. (Doc. 87-3, NDTS Med. R. at 17773-17775). Reynolds tested positive for

benzodiazepines in the first eleven drug tests.  (Id.)  The final twenty-two drug tests Reynolds submitted to in 2005, covering the period from March 24 to December 15, came back negative for unapproved substances.  (Id.)

### *4. New Directions Treatment Services (2006-2008)*

Reynolds continued to receive methadone maintenance treatment at NDTS from 2006 through 2008.  (Id. at 17775-17778).  Reynolds also continued to submit herself to regular drug screens during this time.  (Id.)  Reynolds' tested positive for unauthorized drugs four times out of the approximately seventy-five urine samples she submitted from January 2006 to December 2008.  (Id. at 17775-17778).  Reynolds tested positive for cocaine on August 2, 2007, August 16, 2007 and September 13, 2007.  (Id. at 17776).  Additionally, Reynolds tested positive for opiates on July 10, 2008.  (Id. at 17777).

### B. PA Department of State Complaint Against Reynolds (2005)

Professional licensing in Pennsylvania, including the licensing of nurses, is administered by Defendant Pennsylvania Department of State ("DoS").  (PSOF ¶ 9).  The DoS consists of a number of agencies, such as Defendant Pennsylvania Bureau of Professional and Occupational Affairs ("BPOA"), Defendant Pennsylvania Division of Professional Health Monitoring Programs ("PHMP") and the Pennsylvania Board of Nursing ("BoN"), that regulate and administer certain licensed professions.  (Id. ¶

11).  The DoS receives federal financial assistance.  (Id. ¶ 10).

On February 18, 2005, the complaints office of the DoS received a complaint from Reynolds' then employer, InteliStaf Healthcare.  (DSOF ¶ 47).  The complaint letter states that, while working at a long-term care facility in Easton, Pennsylvania, Reynolds tested positive for benzodiazepines.  (Id.)  The drug test was requested because there were incidents in which Reynolds "occasionally nodded off" and because "her charting was illegible, incorrect, or missing altogether."[6]  (Id. ¶ 49).  The DoS complaints office forwarded the February 18, 2005 complaint letter to PHMP on February 24, 2005.  (Id. ¶ 50).

### 1. Reynolds' Involvement with PHMP

PHMP was formerly known as the "Impaired Professionals Program," and it is currently a division of BPOA.  (PSOF ¶ 12; DSOF ¶ 45).  PHMP provides a means for licensed professionals who suffer from a physical or mental impairment, such as chemical dependency, to be directed to appropriate treatment and receive monitoring to ensure that they can safely practice their licensed profession.  (PSOF ¶ 14; DSOF ¶ 45).  PHMP includes two programs, the Voluntary Recovery Program ("VRP") and the

---

[6] Plaintiff contends that Reynolds appeared exhausted at work in February 2005 because she spent the previous night at her mother's house and took her mother's prescription sleep medication–the benzodiazepine Restoril–instead of her prescribed medication–Ambien. (Doc. 9, Am. Compl. ¶¶ 34-35; PSOF in Opp'n ¶ 84).

Disciplinary Monitoring Unit ("DMU"). (PSOF ¶ 14; DSOF ¶ 45).

PHMP operates the VRP for individual licensees who are suffering from a physical or mental impairment. (PSOF ¶ 15). VRP participants are monitored according to an agreement entered into between the participant and the PHMP. (DSOF ¶ 46). PHMP operates the DMU for licensees who are subject to a consent agreement or order by one of the licensing board, such as the BoN. (Id.; PSOF ¶ 15). DMU licensees are strictly monitored according to the terms of the consent agreement or licensing board order. (DSOF ¶ 46). The same PHMP employees are responsible for both VRP cases and DMU cases. (PSOF ¶ 16).

Throughout her interactions with PHMP, Pearl H. Harris ("Harris") was Reynolds' case manager and Kevin Knipe ("Knipe") served as the case supervisor. (Id. ¶ 13). On March 1, 2005, Harris sent Reynolds a letter informing her that she could enroll in VRP and receive treatment without the need for public action by the BoN. (DSOF ¶ 51). After receiving the letter, Reynolds contacted Harris and expressed her interest in enrolling in VRP and receiving an assessment at A Better Today (hereinafter "ABT")–an alcohol and drug treatment facility. (Id. ¶ 53).

On June 14, 2005, Reynolds received a drug and alcohol evaluation at ABT. (Id. ¶ 54). ABT deemed outpatient treatment appropriate, and from June 14, 2005 to September 7, 2005, Reynolds attended six of

12

sixteen scheduled treatment sessions.  (Id.)  On October 6, 2005,

Reynolds completed a Participation Cooperation form and submitted a

verified statement in which she stated that her chemical dependency

and/or abuse was limited to taking her mother's Restoril.[7]  (Id. ¶¶ 55-56).

On October 7, 2005, Reynolds' VRP file had been closed and forwarded to

BPOA for review regarding the initiation of formal public disciplinary

procedures.  (Id. ¶ 57).  On November 16, 2005, Harris received a letter

from ABT, which advised her that "Ms. Reynolds had been Therapeutically

Discharged as of October 28, 2005 due to non-compliance with treatment

attendance requirements."  (Id. ¶ 58).

### 2. Evaluation by Dr. Woody

On May 22, 2006, the BoN order that Reynolds be evaluated by Dr.

George E. Woody, a nationally respected addiction specialist.  (DSOF ¶

62; PSOF ¶¶ 30-31).  Woody evaluated Reynolds on July 20, 2006 and

subsequently issued a report dated August 30, 2006.  (PSOF ¶¶ 31-32).

Dr. Woody's report concludes with the following assessment:

> In view of her positive response to methadone maintenance
> over a period of at least 1.5 years; the absence of current
> unprescribed drug use by history and a review of the medical
> records, the psychiatric examination and urine test results that

---

[7] In the October 6, 2005 document, Reynolds stated that she is
currently prescribed the following medications: Copegus, Pegasys,
Epogen, Restoril and Xanax.  (DSOF ¶ 60).  Reynolds did not disclose her
history of drug abuse or current methadone use.  (Id. ¶ 61).

were positive only for drugs that are currently prescribed (methadone, benzodiazepine) and the report from a recent employer that her work has been good during a period of time that she has been on methadone, I think she is able to practice nursing with the requisite skill and safety <u>provided she is monitored for a time to be determined by the Board</u>.  She expressed an interest in participating in the VRP if that is possible.

(<u>Id.</u> ¶ 70; DSOF ¶ 63).  The section of the report entitled "History of the Problem as Provided by Ms. Reynolds and the Medical Records," does not mention Reynolds' prior treatment at Saint Claire's Hospital or MCAC. (DSOF ¶ 64).  With respect to her heroin use, Dr. Woody's report simply states that Reynolds "had been taking Percocet regularly and also had 'sniffed' heroin and experienced a runny nose and other mild withdrawal symptoms on days she did not take opioids."  (<u>Id.</u>; Dr. Woody's Med. R. at 17036-17040).

### 3. Consent Agreement and DMU Monitoring

On October 5, 2006, the BPOA, on behalf of the Commonwealth of Pennsylvania, filed an order to show cause as to why Reynolds' license should not be suspended, revoked, or otherwise restricted in light of the fact she was not being monitored as Dr. Woody deemed necessary. (DSOF ¶ 65).  Reynolds never answered the order to show cause, rather, she settled the BoN proceedings against her by entering into a consent agreement and order.  (<u>Id.</u> ¶ 66).

14

Under the terms of the consent agreement, Reynolds was permitted to continue to practice on a probationary status provided that she complied with the terms of the agreement. (Id.) The consent agreement provided that Reynolds' license would be suspended for up to three years if there were a finding that she violated the terms of the agreement. (Id.; DSOF ¶ 68). The terms of the consent agreement also provided that Reynolds (1) obtain written verification of support group attendance, (2) submit to random drug tests as directed by PHMP, (3) arrange to have forwarded to PHMP a copy of her evaluation by a PHMP-approved provider, and (4) pay all costs incurred in complying with the terms of the consent agreement. (Id. ¶ 67). Reynolds, who was represented by counsel, signed the agreement, which the BoN approved on January 4, 2007. (DSOF ¶ 66).

Harris again referred Reynolds to ABT for an evaluation. (Id. ¶ 72). John Siery, an employee of ABT, evaluated Reynolds on January 15, 2007. (PSOF ¶ 36). Siery, however, never prepared a contemporaneous written report concerning Reynolds' evaluation and retired subsequent to his evaluation of Reynolds. (Id. ¶¶ 37-38).

On January 22, 2007, Harris sent Reynolds a letter notifying her that the DMU had been assigned to monitor her compliance with the consent agreement. (DSOF ¶ 69). The January 22, 2007 letter included a DMU personal data sheet, PHMP's support group attendance sheets and

information relative to enrolling in PHMP's drug testing program.  (Id.)  On February 2, 2007, Reynolds signed the DMU's Personal Data Sheet and verified that the statements made in it were true.  (Id. ¶ 70).  Notwithstanding this verification, Reynolds falsely denied that she was the subject of any current or past criminal prosecution and stated that she started methadone maintenance in 2004, instead of the actual starting year of 1997.  (Id. ¶ 71).  Reynolds also failed to provide information about her prior heroin use on her personal data sheet.  (Id.)

On July 11, 2007, nearly six months after her evaluation by Siery, Vincent Carolan, another ABT employee, sent a letter to Harris.  (Id. ¶ 73; PSOF ¶ 38).  In his letter, Carolan identified Reynolds' current diagnosis as opioid dependence and benzodiazepine dependence.  (DSOF ¶ 73).  Carolan's letter concluded with the following assessment:

> Based on the physiological nature of her current ongoing dependence to Xanax and Methadone, Ms. Reynolds was directed to enter into a level 3A Medical Detoxification Unit before being admitted to out-patient therapy with A Better Today.  Ms. Reynolds agreed to enter a facility arranged for by A Better Today.  Although this process was agreed upon and facilitated, Ms Reynolds failed to follow through and made repeated calls to ABT in which she sounded impaired.  Ms. Reynolds and ABT discontinued the unsuccessful clinical process on 1/31/07.

(Id. ¶ 74; PSOF ¶ 38).  Defendants' expert, Dr. Penelope Ziegler, described Carolan's recommended approach of rapid detoxification as

16

inappropriate because such an approach would subject Reynolds, who was receiving 150 mg of methadone per day, to "extreme and unnecessary suffering."  (PSOF ¶¶ 39-41).

### 4. The PHMP Methadone Policy

Since approximately 1993, PHMP has maintained a document known as "standard operating procedures" or "SOPs" which contains standards that are applied by PHMP staff members in their interactions with professional licensees who suffer from a physical or mental impairment. (Id. ¶ 17).  PHMP follows the SOP provisions relating to methadone both for licensees who are participating in the VRP and those subject to the DMU.  (Id. ¶ 18).

From 1993 until at least June 2008, the SOPs included a section entitled "Eligibility, Licensees on Methadone Maintenance."  (Id. ¶ 20). This section provided, in relevant part, as follows:

> [A]ny licensee assessed by a PHMP-approved provider [as] in need of ongoing methadone maintenance will be declared ineligible to participate in the PHMP.  Such licensees will be referred to the Board, with the recommendation that the Board consider any individual requiring maintenance on methadone as unfit to practice.
>
> \*   \*   \*
>
> If treatment alternatives to methadone maintenance are offered/recommended by the PHMP-approved provider, the licensee must agree to medically-supervised withdrawal from methadone within a time-frame established by the PHMP-approved provider (in consultation, whenever possible, with the methadone-administering provider) and the PHMP.

17

(Id.)  Plaintiff's expert witness, Dr. Robert Newman, and defendants' expert witness, Dr. Penelope Ziegler, both criticize the PHMP's 1993-2008 maintenance policy as ill advised.  (Id. ¶¶ 28-29).

### 5. BoN Proceedings

On March 5, 2007, Harris sent Reynolds a letter, in which she notified Reynolds of four instances of non-compliance with the BoN consent agreement and order.  (DSOF ¶ 75).  These instances of non-compliance included Reynolds' failure to:  (1) provide release of information and other related materials in reference to her evaluation and treatment, (2) set-up and provide Random Observed Bodyfluid Screens ("ROBS"), (3) provide support group verification sheets since entering the program in January 2007 and (4) ensure that written reports were sent to the PHMP by her employer and treatment providers.  (Id.)  On April 27, 2007, Harris sent Reynolds a letter notifying her that her violations of the consent order were reported to the DoS Prosecution Division.  (Id. ¶ 76).

On May 9, 2007, the DoS Prosecution Division submitted a petition for appropriate relief to the Probable Cause Screening Committee of the BoN.  (Id. ¶ 77).  Upon receiving the petition, the Probable Cause Screening Committee issued a preliminary order suspending Reynolds' license to practice nursing subject to her right to file an answer and request a hearing.  (Id. ¶ 79).

Reynolds, through her attorney, answered the petition on May 24, 2007, in which she asserted that ABT's recommendation for rapid detoxification was medically inadvisable. (Id. ¶ 80). A BoN hearing examiner held a hearing on Reynolds' case on July 11, 2007. (Id.) The parties stipulated that Reynolds violated the consent agreement, and Reynolds used the hearing as an opportunity to present mitigating evidence in an attempt to preserve her license. (Id. ¶ 85; Doc. 87-8, PHMP File at 983). At the board hearing, Reynolds testified that she struggled to work the night shift at her first job as a registered nurse at the Pocono Medical Center. (DSOF ¶ 81). Reynolds also testified before the hearing examiner that she was taking methadone for menstrual pain management, and she did not testify about her twenty-year opioid addiction. (Id. ¶ 82). During her hearing testimony, Reynolds proffered that the proceedings against her were initiated after she took Restoril (a benzodiazepine) in February 2005 to help her sleep while at her mother's house.[8] (Id. ¶ 83). Furthermore, Reynolds stated that she would be committed to being detoxed from methadone if she had no choice and was forced to choose between methadone and her career. (See Doc. 87-9, Nursing Bd. Proceedings at 22360).

---

[8] The parties dispute whether it would have been possible for Reynolds to test positive for Restoril two days after she allegedly took it. (DSOF ¶ 84; PSOF in Opp'n ¶ 84).

19

On August 10, 2007, the hearing examiner issued a decision and proposed order in this matter. (Doc. 87-8, PHMP File at 982-1012). The hearing examiner found that Reynolds violated the consent agreement because she (1) failed to enroll in First Lab (random unannounced and observed body fluid toxicology screens), (2) failed to submit monthly verification that she was attending support group meetings, and (3) failed to comply with her evaluation treatment recommendation that she enter inpatient treatment and be weaned from methadone. (DSOF ¶ 86). The hearing examiner ordered that Reynolds' license to practice nursing be suspended for three years; however, the hearing examiner ordered that the suspension be stayed once Reynolds provided BoN with an evaluation from an approved treatment provider that she can safely practice nursing. (Id. ¶ 87). Thus, under the provisions of the proposed order, Reynolds could return to practice as a nurse even if she still received methadone maintenance treatments, so long as she received the clearance to do so by a PHMP-approved provider. (PSOF ¶ 51; DSOF in Opp'n ¶ 51).

### 6. Suspension of Reynolds' License

Neither party filed exceptions to the hearing examiner's proposed order, and the BoN adopted it as their final order on September 18, 2007. (DSOF ¶ 88). Since the date of the BoN decision, Reynolds has not provided the BoN with an evaluation from an approved treatment provider

that she is safe to practice nursing. (Id. ¶ 90). Plaintiff asserts, however, that Reynolds was never informed that she could obtain an evaluation from a provider other than ABT. (PSOF in Opp'n ¶ 91).

In February 2008, Dr. William Santoro, an addiction medicine specialist who treated Reynolds at NDTS, contacted ABT to discuss Reynolds' treatment and to express concern about the recommendation that Reynolds be rapidly withdrawn from methadone. (PSOF ¶¶ 42-43). After speaking with the ABT counselor that met with Reynolds, Dr. Santoro wrote a letter to Harris dated February 15, 2008. (Id. ¶ 44). In this letter, Dr. Santoro expressed his concern regarding ABT's bias against treating addictions with medication and specifically against treating opioid addiction with methadone. (Id.) Dr. Santoro requested that Reynolds be sent to another program that would consider all scientifically proven methods of treatment. (Id.) Although she received Dr. Santoro's letter, Harris testified that she never spoke to him or otherwise responded to it because there was "no release of information in the file for Dr. Santoro."[9] (Id. ¶ 46).

---

[9] Harris allegedly searched for a release for PHMP to share information about Reynolds with Dr. Santoro, but, after she was unable to locate a release in the file, Harris turned Dr. Santoro's letter over to Knipe. (DSOF ¶ 89; DSOF in Opp'n ¶ 46). Despite Harris' inability to locate a release, NDTS records reveal that Reynolds signed a release dated December 27, 2007, which authorizes PHMP to disclose information to NDTS. (PSOF in Opp'n ¶ 89). Moreover, Harris did not make an effort to obtain a release to speak to Dr. Santoro. (PSOF ¶ 47).

In March 2008, Harris sent a letter to Reynolds that stated that her PHMP file had been closed.  (Id. ¶ 52).  The letter also stated that a precondition for re-opening Reynolds' PHMP file was for ABT to send PHMP a statement "indicating that you have fully and completely complied and cooperated with recommendations to enter inpatient treatment to be weaned from methadone."  (Id. ¶ 52).

### C. Notable Events after Reynolds' License was Suspended

On June 26, 2009, Reynolds was arrested for driving under the influence of a controlled substance, and on November 16, 2009, she was admitted to an ARD program and her driver's license was suspended for sixty days.  (DSOF ¶ 94).  On December 5, 2009, Reynolds was arrested for driving with a suspended license.  (Id. ¶ 95).  On July 20, 2010, Reynolds pled guilty to that charge and was sentenced by the Monroe County Court of Common Pleas to sixty days incarceration.  (Id.)  While she was jailed, Reynolds was not permitted to receive methadone, and she experienced the adverse effects of rapid opioid detoxification.  (PSOF in Opp'n ¶ 96).  Reynolds completed her sentence on September 17, 2010.  (DSOF ¶ 95).

The day after her release from jail, Reynolds was found unresponsive in her home by a neighbor.  (Id. ¶ 96).  The Pocono Mountain Regional EMS was dispatched to Reynolds' house, and, after treatment by the EMS

team, Reynolds regained consciousness.  (Id.)  Reynolds initially denied

use of narcotics, but, according to the EMS report, she eventually stated

that she had taken Methadone and Xanax within twenty minutes of each

other earlier in the evening.[10]  (Id.)   Reynolds returned to NDTS on

September 23, 2010, and she was restarted on methadone maintenance

treatment at a minimal starting dose.  (PSOF in Opp'n ¶ 96).

On June 20, 2011, Reynolds was involved in a car accident and

taken to St. Luke's Hospital.  (DSOF ¶ 97).  The assessment of the ER

physical was that Reynolds suffered from an altered mental status.  (Id.)

An initial drug screen showed that she tested positive for benzodiazepines,

methadone and tricyclic antidepressants.  (Id. ¶ 98).  The attending

physician noted that Reynolds appeared to be lethargic.  (Id.)

On August 19, 2011, Reynolds was arrested for driving under the

influence of a controlled substance and driving while operator's privileges

were suspended or revoked.  (Id. ¶ 99).  A toxicology report showed the

presence of, among other drugs, diazepam (Valium), Alprazolam (Xanax)

and methadone. (Id.)

NDTS records through the end of November 2011 demonstrate

several instances in which plaintiff was lethargic, spoke with slurred

---

[10] The September 18, 2010 incident occurred after Reynolds took a pre-incarceration "take home" dose of methadone.  (PSOF in Opp'n ¶ 96).

23

speech and/or purchased pills from other patients.  (Id. ¶¶ 100-106).  In

fact, on November 28, 2011, Reynolds appeared in such a heavily sedated

state that NDTS staff members called EMS to take her to the hospital.  (Id.

¶ 107).  During this time period, Reynolds was advised by NDTS staff

members to enter an inpatient treatment program for benzodiazepine

detoxification because of the problems she was experiencing.  (PSOF in

Opp'n ¶¶ 101-107).  Reynolds was treated at the Reading Hospital and

Medical Center Detoxification and Rehabilitation Unit from December 13,

2011 to January 9, 2012, where they "successfully" weaned her from

benzodiazepines.  (Id.)

On February 18, 2012, Reynolds was found lying on the side of a

road.  (DSOF ¶ 108).  She was transported to the Pocono Medical Center

and was pronounced dead.  (Id.)  The autopsy report identifies the cause

of death as mixed substance toxicity and hypothermia.  (Id.)  In a blood test

performed forty-nine hours after Reynolds was pronounced dead, medical

examiners found methadone, a methadone metabolite called EDDP and

Xanax.  (Id.; PSOF in Opp'n ¶ 108).  The autopsy report also records,

"[f]amily states deceased had a previous incident, approx. 3 months ago,

where she was found along the road, unresponsive, at which time she was

hospitalized at the ICU."  (DSOF ¶ 108).

### D. Procedural History

Reynolds initiated the instant action on August 4, 2009.  (Doc. 1, Compl.).  Reynolds amended the complaint on November 4, 2009.  (Doc. 9, Am. Compl.)  The amended complaint raises three counts related to defendants' alleged violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, *et seq.*, and Section 504 of the Rehabilitation Act, ("RA"), 29 U.S.C. § 794.  Count one seeks a declaration from the court that defendants' policy of excluding from licensing nurses who are in a methadone maintenance program violates the ADA and the RA.  Count two seeks injunctive relief for this alleged violation of federal anti-discrimination law.  Count three seeks damages for the harm Reynolds suffered.

Defendants responded to the amended complaint with a motion to dismiss.  (Doc. 13, Mot. to Dismiss).  The court denied the motion to dismiss in part and granted it in part.  (Doc. 36, Mem. & Order dated June 21, 2010).  Specifically, the court granted defendants' motion to dismiss with respect to the claims for damages against the individual defendants and denied the motion in all other respects.

Defendants answered the amended complaint on August 30, 2010, and on October 26, 2010, the court held a case management conference. (Doc. 43, Answer; Doc. 47, Case Management Order).  After approximately

two years of discovery, the parties filed the instant cross-motions for summary judgment. The parties fully briefed the cross-motions for summary judgment and the court heard oral arguments in this matter on May 23, 2013, thus bringing this case to its current posture.

## Jurisdiction

Plaintiff asserts claims pursuant to the ADA, 42 U.S.C. §§ 12101, *et seq.*, and the RA, 29 U.S.C. § 794. The court has jurisdiction pursuant to 28 U.S.C. § 1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

## Standard of Review

Granting summary judgment is proper "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Knabe v. Boury Corp., 114 F.3d 407, 410 n.4 (3d Cir. 1997) (quoting FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. See Anderson, 477 U.S. at 248. A fact is material when it might affect the outcome of the suit under the governing law. Id. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by establishing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories demonstrating a genuine issue for trial. Id. at 324; see also Goode v. Nash, 241 F. App'x 868 (3d Cir. 2007) ("[A]lthough the party opposing summary judgment is entitled to 'the benefit of all factual inferences in the court's consideration of a motion for summary judgment, the nonmoving party must point to some evidence in the record that creates a genuine issue of material fact,' and 'cannot rest solely on assertions made in the pleadings, legal

memorandum, or oral argument.'" (quoting <u>Berckeley Inv. Grp., Ltd. v. Colkitt</u>, 455 F.3d 195, 201 (3d Cir. 2006))).

**Discussion**

At the close of discovery, the parties filed cross-motions for summary judgment. In her motion, plaintiff contends that partial summary judgment is appropriate with respect to the validity of the methadone policy as it applied to Reynolds. In their motion, defendants maintain that they are entitled to summary judgment because plaintiff is unable to meet her burden at trial as a matter of law. For the following reasons, the court agrees with defendant and will grant their summary judgment motion.

The court's analysis of plaintiff's claims under Title II of the ADA and Section 504 of the RA are similar. <u>See</u> <u>New Directions Treatment Servs. v. City of Reading</u>, 490 F.3d 293, 302 (3d Cir. 2007). Title II of the ADA provides that "no qualified individual with a disability shall, **by reason of such disability**, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (emphasis added). Similarly, Section 504 of the RA provides that "[n]o otherwise qualified individual with a disability . . . . shall, **solely by reason of her or his disability**, be excluded from the participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving

28

federal financial assistance . . . ."  29 U.S.C. § 794(a) (emphasis added).

Thus, "[w]ith the exception of the [federal financial assistance] element,

which is not pertinent to a claim brought under the ADA, the elements of a

claim under Titile II of the ADA are interchangeable with the elements of a

claim under Section 504."  Inmates of Allegheny Cnty. Jail v. Wecht, 93

F.3d 1124, 1136 (3d Cir. 1996).

Although the elements of a Title II ADA claim and a Section 504 RA

claim are largely the same, there is a variation in the causation provisions

of each statute.  Specifically, the ADA precludes government discrimination

"by reason of" an individual's disability while the RA prohibits such conduct

"solely by reason of" an individual's disability.  See 29 U.S.C. § 794(a); 42

U.S.C. § 12132.  The omission of the word "solely" in the ADA indicates

that Congress intended for this statute to have a less stringent causation

requirement compared to Section 504.  See Maples v. Univ. of Tex. Med.

Branch at Galveston, No. 12-41226, 2013 WL 1777501, at *2 n.2 (5th Cir.

Apr. 26, 2013).

With respect to the ADA's less stringent causation requirement, the

Third Circuit Court of Appeals has held that "the ADA's 'by reason of'

language requires" the plaintiff to "demonstrate that, but for the failure to

accommodate, he would not be deprived of the benefit he seeks."

Muhammad v. Court of Common Pleas of Allegheny Cnty., 483 F. App'x

759, 764 (3d Cir. 2012).  In fact, courts are prohibited from applying mixed-motive analysis in lieu of requiring the plaintiff to establish but-for causation unless the particular anti-discrimination statute permits otherwise.[11]  See Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 175-76 (2009).

In Gross, the United States Supreme Court held that mixed-motive claims are not authorized by the Age Discrimination in Employment Act ("ADEA") because the ADEA lacks the language found in Title VII expressly recognizing such claims.  See id.  Courts have found that the ADA, like the ADEA, does not have statutory language that expressly permits mixed-motive analysis and that plaintiffs must prove but-for cause if they seek to prevail in an ADA claim.  See Cottrell v. Good Wheels, No. 08-1738, 2011 WL 900038, at *6 n.5 (D.N.J. Mar. 15, 2011) (citing Warshaw v. Concentra Health Servs., 719 F. Supp. 2d 484, 502 (E.D. Pa. 2010)); see also Serwatka v. Rockwell Automation, Inc., 591 F.3d 957, 962 (7th Cir. 2010) ("[A] plaintiff complaining of discriminatory discharge under the ADA must show that his or her employer would not have fired him but for his actual or perceived disability; proof of mixed motives will not suffice.").  Accordingly, to satisfy the ADA's causation requirement, the plaintiff must establish that the exclusion or denial of a government benefit

---

[11]  "Mixed-Motive Analysis" in a discrimination case is when the evidence of the case shows that the complained of action was based, in part, on a nondiscriminatory reason and in part on a discriminatory reason.

or service would not have occurred absent the plaintiff's disability or the defendant's failure to provide a reasonable accommodation.

In the instant case, Reynolds' nursing license is the government benefit at issue. (See Compl. ¶¶ 19, 77, 91). Plaintiff further claims that defendants discriminated against Reynolds' disability, as a recovering drug addict, by following a methadone policy that opposed methadone maintenance treatment for licensees.[12] (See id.). Although plaintiff seeks to have the court treat this case as if it is about nothing other than PHMP's methadone policy, the facts require otherwise. For the following reasons, a reasonable jury could not find that the methadone policy was the but-for cause of the loss of Reynolds' license; thus, plaintiff would be unable to meet her burden at trial with respect to the less stringent ADA causation requirement or the more exacting RA standard.

**A. The Undisputed Facts Demonstrate that the BoN Order Suspending Reynolds' License was Based on Grounds Other than her Methadone Maintenance Treatment**

Reynolds' license was suspended because she violated several provisions of the consent agreement, not merely because she failed to

---

[12] Under both the ADA and RA, drug addiction is included within the meaning of disability, where the impairment is not due to the "current illegal use of drugs." 28 C.F.R. § 35.104. The illegal use of drugs "does not include the use of a drug taken under supervision by a licensed health care professional, or other uses authorized by the Controlled Substances Act or other provisions of Federal law." Id.

31

detox from methadone.  The parties agree that Reynolds, in response to an order to show cause, entered into a consent agreement with defendants.  (DSOF ¶¶ 65-66; PSOF ¶¶ 65-66).  In addition to requiring that Reynolds comply with the treatment recommendations of a PHMP-approved provider, the consent agreement also required written verification of support group attendance as well as random drug screening.  (See Doc. 87, Nursing Bd. Proceedings at 22391-22410).

When charged with violations of the consent agreement, Reynolds requested a hearing, at which she told the hearing examiner that she did not comply with ABT's treatment recommendations because they required her to stop taking methadone.  (Id. at 22366).  Reynolds, however, admitted that she violated other provisions of the consent agreement for reasons unrelated to methadone maintenance treatment.  (Id. at 22364-22365).  Reynolds admitted that she did not comply with PHMP's drug testing program because she did not want to pay for it, even though she knew she was obligated to pay for such tests when she entered into the consent agreement.  (Id.)  Reynolds also conceded that she did not regularly attend support group meetings because of changes in her personal life.  (Id. at 22364).  Additionally, Reynolds failed to provide proper documentation of the meetings she attended because she "didn't per se see an attendance sheet" when such a sheet was mailed to her.

(Id.)

Given her admissions, the hearing examiner unsurprisingly found Reynolds in violation of the consent agreement because she (1) failed to enroll in drug testing, (2) failed to submit monthly verification of the support group meetings and (3) failed to follow the recommendations of her treatment provider. (See Doc. 87-8, PHMP File at 982-1012). Receiving no objections to the hearing examiner's findings and proposed order from Reynolds, the BoN ordered Reynolds' license suspended on September 18, 2007. (DSOF ¶ 88).

A closer review of the hearing officer's first two findings pertaining to drug testing and support groups reveals that they are unrelated to methadone. Thus, even if Reynolds had successfully detoxed from methadone as instructed by ABT, she nonetheless would have been in violation of the consent order, and these violations would have been sufficient to maintain BoN proceedings against Reynolds' license. (See Doc. 84-5, App. Tab B, Ziegler Report at 11).

Even plaintiff acknowledges that the decision to suspend Reynolds' license was based, in part, on violations of portions of the consent agreement that are independent of those provisions related to treatment recommendations. Plaintiff, however, qualifies her acceptance of this fact and asserts, without citing to any evidence, that "all of these other alleged

grounds followed from her decision not to proceed with 'A Better Today.'"

The court cannot consider such unsupported conjecture in evaluating this

motion for summary judgment.  See Colkit, 455 F.3d at 201.  Therefore,

the court finds that the undisputed record establishes that the decision to

suspend plaintiff was premised on additional grounds aside from her failure

to comply with ABT's treatment recommendations.

### B. No Triable Issues of Fact Exist to Establish that the Methadone Maintenance Policy was the But-For Cause of the Suspension of Reynolds' Nursing License

As the court discussed above, the undisputed facts of record

establish that Reynolds was suspended for other grounds aside from her

failure to comply with ABT's treatment recommendations.  Moreover, the

evidence of record reveals that these other non-compliant behaviors, such

as her failure to enroll in drug testing and attend support groups, would, in

and of themselves, be sufficient for a referral to the BoN for violating the

terms of her consent order.  Given these facts, and in the absence of a

genuine issue of material fact to the contrary, the only conclusion the court

can reach at this stage in the litigation is that the methadone maintenance

policy was not the but-for cause of Reynolds' suspension.  Thus, the

question before the court is whether a genuine issue of material fact exists

with respect to whether the methadone maintenance policy was the

dispositive factor in the decision to suspend Reynolds' license.

Plaintiff presents several legal and factual arguments in support of her contention that the PHMP's methadone maintenance policy was the but-for cause of Reynolds' suspension. Although neither the facts nor the law support plaintiff's position, the court will nonetheless examine plaintiff's arguments in turn.

Plaintiff first contends that Reynolds should be legally excused from the consent agreement's requirements. Specifically, in a post-argument letter to the court, plaintiff contends that "Reynolds was not required to take actions (such as enrolling for additional drug screens or attending support group meetings) that would have been futile because of the Methadone Maintenance Policy." (Doc. 124, Letter dated May 29, 2013). In support of this allegation, plaintiff cites Davoll v. Webb, 194 F.3d 1116 (10th Cir. 1999). In Davoll, the plaintiffs, disabled Denver Police Department officers, were aware of a policy that prohibited the transfer of police officers to department jobs that did not require officers to fire weapons and make arrests. See id. at 1133. When this case was appealed, the Tenth Circuit Court of Appeals affirmed the district court's instruction that an employee need not request a reasonable accommodation under the ADA if the employer has a policy forbidding that reasonable accommodation and the employee has knowledge of this policy. See id. at 1132-33 ("If a disabled employee actually knows of an employer's discriminatory policy against

35

reasonable accommodation, he need not ignore the policy and subject himself 'to personal rebuffs' by making a request that will surely be declined.").

In Davoll, the futile gesture–requesting a transfer the plaintiffs knew would be denied–was directly related to the discriminatory policy. See id. at 1132-33. In this case, however, the conduct at issue–Reynolds' failure to submit to drug screening and support group meetings–is unrelated to the allegedly discriminatory methadone maintenance policy. The monitoring requirements contained in the consent agreement constitute an independent obligation plaintiff agreed to abide by when she signed the consent agreement. Accordingly, the futile gestures doctrine does not apply to this case.[13]

––––––––––––––––––

[13] The court also disagrees with plaintiff's insinuations that minimize the significance of Reynolds' failure to comply with the drug screening and support group requirements contained in the consent agreement. The court notes that the monitoring requirements Reynolds agreed to amount to more than mere gestures, and it is PHMP's mission to monitor professionals suffering from physical or mental impairments to ensure that they can safely practice their professions. By failing to enroll in toxicology screens and drug testing, PHMP could not know whether or not Reynolds, an at-risk professional on probation, was impaired and unable to safely practice nursing because of drug use. Similarly, by failing to provide documentation of support group attendance, PHMP could not know whether Reynolds was receiving part of the treatment envisioned in the consent agreement. In fact, with respect to the need for Reynolds to be monitored, Dr. Woody, whose 2006 evaluation plaintiff heralds as evidence that Reynolds could have practiced nursing safely, recognized the

36

Plaintiff also contended at oral argument that two pieces of evidence in the record created a triable issue of material fact with respect to whether the methadone maintenance policy was the but-for cause of Reynolds' suspension. Plaintiff first pointed to Harris' March 13, 2008 letter in which she notified Reynolds that her PHMP file had been closed. (Doc. 84-9, App. Tab F, Harris Letter dated Mar. 13, 2008). This letter is administrative in nature and was sent to Reynolds months after the BoN revoked her license. It is undisputed that this letter did not affect the status of Reynolds' nursing license. This letter also fails to support the conclusion that the drug testing and support group requirements of the consent agreement are somehow pretextual.

Rather, plaintiff quotes the portion of Harris' March 13, 2008 letter that states as follows:

> once our office receives a written statement from your PHMP-Approved Evaluator (A Better Today, Inc.) indicating that you have fully and completely complied and cooperated with recommendations to enter inpatient treatment to be weaned from methadone and that you are safe to practice in the Commonwealth of PA, we will re-open your File and begin monitoring you under the terms and conditions of probation.

(Doc. 84-9, App. Tab F, Harris Letter dated Mar. 13, 2008). Plaintiff

---

importance of monitoring and stated that Reynolds could **only** practice nursing if she was monitored by the BoN. Accordingly, the court will not ignore the independent significance of the consent agreement's provisions requiring drug screening and support group attendance.

contends that this letter is evidence that the methadone maintenance policy was the but-for cause of Reynolds' suspension. The above-quoted portion of Harris' letter appears to reference the hearing officer's proposed order, which provided that Reynolds' suspension would be stayed if she could provide the BoN with an evaluation from an approved provider stating that it was safe for her to practice nursing. What Harris precisely intended by her comment in this letter, however, is ultimately irrelevant because Harris, as a PHMP case-worker, did not define the terms of Reynolds' suspension. The terms of Reynolds suspension were exclusively controlled by the hearing examiner's findings and the BoN order, and Harris' letter presents no evidence that either of these were influenced primarily by PHMP's methadone maintenance policy.

Plaintiff also contended at oral argument that a September 17, 2007 email sent by Knipe to the general counsel's office of the BoN showed that the methadone maintenance policy was the but-for cause of Reynolds' suspension. In this email , Knipe generally informs the BoN that PHMP will not grant permission for a nurse on methadone to practice. (See Doc. 99-1, App. Tab O to Pl.'s Reply Br.). This email, at best, confirms the existence of the methadone maintenance policy that defendant concedes existed in 2007. This email does not affect the undisputed fact that Reynolds was also suspended for failing to comply with drug testing and

support group attendance requirements, and that, irrespective of PHMP's policy on methadone, Reynolds was in breach of the consent agreement. Like Harris' March 2008 letter, Knipe's September 2007 email does not create a genuine issue of material fact upon which a jury could find for plaintiff.

At this stage in the litigation, the court cannot presume as true plaintiff's allegation that the methadone maintenance policy was the but-for cause of Reynold's license suspension. Rather, the record must contain some triable fact that would allow a reasonable jury to find it to be true. No such triable facts exist in this case, and the undisputed evidence from Reynolds' testimony at her BoN hearing reveals that she violated portions of the consent agreement due to reasons unrelated to methadone maintenance treatment. These other violations were independently sufficient to sustain the revocation proceedings against Reynolds. Therefore, plaintiff's ADA claim must fail because no reasonable jury could find that PHMP's methadone maintenance policy was the but-for cause of Reynolds' suspension. Moreover, plaintiff's inability to satisfy the ADA's causation requirement necessarily means that she cannot satisfy the RA's more stringent causation requirement. Thus, the court will grant defendants' motion with respect to both claims.

**Conclusion**

After considering the extensive record of this case and the arguments contained in the parties' lengthy briefs, the court agrees with defendants that plaintiff is unable to meet her burden at trial as a matter of law. The evidence is such that a reasonable jury could not return a verdict for plaintiff. Specifically, the admissible evidence of record is insufficient to meet plaintiff's burden of establishing that Reynolds' nursing license was revoked by reason of PHMP's methadone maintenance policy. Because plaintiff cannot establish a prima facie case under the ADA or RA, the court will grant defendants' motion for summary judgment and deny plaintiff's motion for partial summary judgment. The court need not address the parties' other arguments as plaintiff cannot succeed as a matter of law. An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BEVERLY LAMBERSON, as** | : | **No. 3:09cv1492** |
| **Administratrix, of the Estate of** | : | |
| **Melinda Lamberson Reynolds,** | : | **(Judge Munley)** |
| **Deceased,** | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **COMMONWEALTH OF** | : | |
| **PENNSYLVANIA,** | : | |
| **PENNSYLVANIA DEPARTMENT OF** | : | |
| **STATE, PENNSYLVANIA BUREAU** | : | |
| **OF PROFESSIONAL &** | : | |
| **OCCUPATIONAL AFFAIRS,** | : | |
| **PENNSYLVANIA DIVISION OF** | : | |
| **PROFESSIONAL HEALTH** | : | |
| **MONITORING PROGRAMS,** | : | |
| **PENNSYLVANIA STATE BOARD OF** | : | |
| **NURSING, BASIL L. MERENDA,** | : | |
| **LINDA TANZINI AMBROSO,** | : | |
| **K. STEPHEN ANDERSON,** | : | |
| **CHRISTOPHER BARTLETT,** | : | |
| **RAFAELA COLON, KATHLEEN M.** | : | |
| **DWYER, JUDY A. HALE, SUZANNE** | : | |
| **M. HENDRICKS, JOSEPH J.** | : | |
| **NAPOLITANO, ANN L. O'SULLIVAN,** | : | |
| **JANET H. SHIELDS and JOANNE L.** | : | |
| **SORENSEN,** | : | |
| **Defendants** | : | |

## ORDER

**AND NOW**, to wit, this 5th day of August 2013, it is hereby

**ORDERED** as follows:

1. Plaintiff's motion for partial summary judgment (Doc. 84) is

41

**DENIED**;

2. Defendants' motion for summary judgment (Doc. 85) is

**GRANTED**;

3. The Clerk of Court is directed to enter judgment in favor of

defendants and against plaintiff; and

4.  The Clerk of Court is directed to **CLOSE** this case.


**BY THE COURT:**


 **s/ James M. Munley**
**JUDGE JAMES M. MUNLEY**
**United States District Court**